T. C. COXE ET AL. v. MARGARET CARSON ET AL.

(Filed 12 May, 1915.)

**1. Trusts and Trustees—Parol Trusts—Long Delays—Evidence—Burden of Proof.**

Where a parol trust is sought to be engrafted upon the legal title to lands, that the grantee should reconvey the lands if the profits in operating a gold mine thereon for a reasonable length of time would repay a debt owed by the plaintiff to him, the plaintiff fails to show that the profits would be sufficient within such time where the evidence, as in this case, is too indefinite and uncertain to be submitted to the jury.

**2. Trusts and Trustees—Parol Trusts—Repudiation of Trusts—Deeds and Conveyances—Registration—Limitation of Actions.**

Where the holder of the legal title to lands conveys the same by deed of trust to another as trustee, with power of sale, and the deed is registered and the *cestui que trust* enters into the possession and use of the lands, the act of such holder is a repudiation of any parol trust which may be sought to be engrafted upon his title, and the statute of limitations commenced to run from the time the alleged trustee had placed himself in this hostile attitude towards the beneficiaries of the parol trust.

**3. Trusts and Trustees—Married Women—Interpretation of Statutes—Limitation of Actions.**

Chapter 78, Laws 1899, brings a married woman within the operation of the statute of limitations, and she may be barred thereby from asserting her rights as a beneficiary under a parol trust in lands.

**4. Trusts and Trustees—Parol Trusts—Laches—Presumptions—Equity—Evidence.**

Where a party to a suit to establish a parol trust in lands has delayed for an apparently unreasonable period of time to assert his rights after knowledge of a repudiation thereof by the holder of the legal title, it is necessary for him to clearly establish the trust relation, and in order for him to have a reasonable and legal excuse for the delay he must show a fraudulent concealment of the facts from him materially relating to his rights, due diligence on his part, etc.; and equity will not interfere in his behalf, or rebut the presumption that the trusts have been satisfied, in the absence of his explanation for the delay, especially when the adverse party is deprived thereby, as, for example, by the loss of important evidence, of ascertaining the nature of the original transaction, or of evidence to disprove the existence of the trust relation sought to be established.

**5. Vendor and Vendee—Defeasible Purchase—Mortgages—Mortgagor's Possession—Limitation of Action.**

Where one has taken the title, possession, and use of lands upon the agreement that if the profits are sufficient to pay off a certain debt owed to him within a reasonable time he will make a reconveyance of the lands to the borrower the transaction is in the nature of a defeasible purchase; but if construed as a mortgage in this case, *semble*, the lender's possession thereunder for ten years will bar the borrower's right of action as mortgagor.

**6. Limitation of Actions—Mortgagor's Possession—Equity—Accounting.**

It being held in this case that the defendants are barred by the statute of limitations, and by their laches, in equity, from establishing a parol trust in the plaintiff's lands, it became unnecessary to decide the question whether, under the circumstances, the defendants really held an equity in the said lands, or were entitled to an accounting, or other relief.

APPEAL by defendants from *Long, J.,* at Fall Term, 1914, of BURKE.

This action was brought to quiet title to land under the statute, and to remove a cloud from the same. Plaintiffs, as heirs and devisees of Frank Coxe, allege title to the land, known as the "Brindletown Gold Mines," the interest in one-half of which was acquired by an absolute deed from Joseph C. Mills, Mrs. Margaret Carson, and Mrs. Rachel L. Williams to the said Frank Coxe, dated 22 December, 1880, the said parties being at that time tenants in common of said land. The defendants, Mrs. Carson and the heirs of Mrs. Williams, allege in their answer, and offered proof to show, that the deed to Frank Coxe was taken by him subject to a trust "to develop and improve the land and to receive the issues, rents, and profits thereof, and when he had received from said land the amount of money which he had paid out, with interest accruing thereon, the property was to be conveyed to the makers of said deed; and the said Frank Coxe, prior to the execution of said deed, agreed that

he would take the same and would take charge of said property, develop the same in the best and most practicable way, collect the issues, rents, and profits therefrom, and realize from said property all that the same was capable of producing, and that when the sums of money paid out by him should have been returned to him he would reconvey the property so conveyed to him by said deed to the said Rachel L. Williams and Margaret C. Carson; and that the said Frank Coxe, during his lifetime, held said property upon said trust and upon the agreement and understanding that his executors would reconvey the same to the said Margaret C. Carson and Rachel L. Williams in accordance with their interest as hereinbefore set forth." On 28 March, 1882, Frank Coxe conveyed to Joseph C. Mills an undivided five-twelfths interest in said land, and on 21 February, 1895, Frank Coxe and Joseph C. Mills conveyed the land to George Phifer Erwin in trust to secure the performance of certain covenants entered into by the Piedmont Mineral Company, Limited, which company had agreed to purchase the land for the purpose of mining the same for gold and other minerals. J. C. Mills and the mineral company took possession of the land, claiming it as their own, the said Mills so far as he had an interest in the same, and the possession was afterwards held adversely by Mills, as to his interest. The mineral company worked the mines, but failed to perform its covenants, and finally abandoned their rights under the contract. A few acres of the land were conveyed to May Mills in severalty, and she immediately took possession of the same and has kept possession thereof ever since. The deed of Coxe and Mills to the mineral company was registered in Burke County on 21 February, 1895, and the other deeds were duly registered soon after they were executed.

The plaintiffs denied that any such trust as set up by the defendants had ever attached to their title, and averred that they were the absolute and unconditional owners in fee of the said land. "It was admitted that the said Frank Coxe and J. C. Mills and other persons claiming under them had been in possession of the said lands described in paragraph 3 of the complaint (which are the lands in question), occupying, using, and receiving the rents and profits therefrom from 22 December, 1880, up to the time of the trial. There was also evidence offered tending to show that the property described in paragraph 3 of the complaint was usually known and referred to in 1880 and since that time as the Brindletown Gold Mining property." The plaintiffs also pleaded the bar of the statute of limitations in every form, also the presumption that all equitable right or interest of the defendants in the land, if any ever existed, had been waived and abandoned, and that said alleged equity had been lost by their laches.

The court submitted issues to the jury and directed them to answer the second issue, as to the trust, "No," if they believed the evidence, and

find the facts to be as testified to by the witnesses, which the jury did, and from the judgment entered upon the verdict the defendants appealed.

Bourne, Parker & Morrison and Avery & Erwin for plaintiffs.
Martin, Rollins & Wright and Mangum & Woltz for defendants.

WALKER, J., after stating the case: It is so clear to us, at least, that the defendant's cause of action is barred upon any one of the three grounds we will state, that it becomes unnecessary to consider the case upon the instruction given to the jury as to the second issue. If there was an express trust, the defendants cannot recover on their counterclaim, because, in the first place, it was not to attach to the legal estate in Frank Coxe unless the mines yielded enough clear profit "in any reasonable term of years to pay me (Coxe) back the money I have paid you (Mrs. Carson and Mrs. Williams) and Joe, and whatever else I spend on it, with legal interest." The amount paid by Frank Coxe to the three, Mrs. Carson, Mrs. Williams, and Joseph C. Mills, was $6,000, in December, 1880. There is no legal evidence that the mines yielded such a profit within a reasonable number of years after the said date, but what evidence there is on that question—unsatisfactory, indefinite, and uncertain as it is, in any view—tends to show that no such profit was realized. No court would allow a verdict, finding that there was a sufficient profit, to stand upon any such testimony. It would be bare conjecture and speculation. Byrd v. Express Co., 139 N. C., 273; Foy v. Lumber Co., 152 N. C., at p. 598. The profits from these mines, up to this date, so far as the case shows, would not be sufficient to pay the principal and accrued interest, which would be $21,000 or more, even if we can assume that all the gold referred to in the testimony was taken from these lands, and this does not take into account the cost and expense of machinery and operation or other incidental expenditures.

But, upon another ground, the defendants must fail, even if the trust originally was an express one. The evidence shows that in March, 1882, Frank Coxe sold a five-twelfths undivided interest in the land to Joseph C. Mills, and conveyed to him a fee simple absolute, or without any declaration of trust, and Joseph C. Mills took possession of the land under his deed, and in 1895 he and Frank Coxe united in a deed to George Phifer Erwin, by which they conveyed to him the entire land upon the trusts specified, one of which provided for an absolute sale of the lands to the Piedmont Mineral Company. This deed was registered in February, 1895, just after it was executed, and the mineral company took possession of the property thereunder and conducted mining operations thereon. These were clearly repudiations of the trust, if any such existed, and the statute of limitations commenced to run from the time

that the alleged trustee had placed himself in this hostile attitude towards the beneficiaries of the trust. A reasonable time had then elapsed, that is, in 1895, to thoroughly test the mines for the purpose of determining whether they would yield the contemplated profits. The evidence shows that so much time was not required for that purpose. By act of 1899, ch. 78, marriage ceased to be a disability under the statute of limitations, and married women are no longer exempted from its operation by reason of their coverture. As in 1895 Coxe and Mills had repudiated the trust or considered it at an end by open and notorious acts and conduct indicating an intention no longer to recognize it, and after a reasonable time had elapsed to ascertain if sufficient profits could be realized to repay the purchase money, interest, cost, and expense, the statute then was put in motion, and did not cease to run because of the coverture of Mrs. Carson and Mrs. Williams. There can be no doubt that Frank Coxe and Joseph C. Mills assumed a hostile attitude many years ago, one entirely inconsistent with the idea that they held the land in trust for the defendants or those under whom they claim, and they evinced this hostility to the alleged trust in the most open and notorious manner. In *Badger v. Badger,* 2 Wall. (69 U. S.), 87, the Court, referring to laches and the rule barring the prosecution of stale claims, said, at pp. 94, 95: "Now, the principles upon which courts of equity act in such cases are established by cases and authorities too numerous for reference. The following abstract, quoted in the words used in various decisions, will suffice for the purpose of this decision: 'Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitation which govern courts of law in like cases, and this rather in obedience to the statutes than by analogy. In many other cases they act upon the analogy of the like limitation at law. But there is a defense peculiar to courts of equity founded on lapse of time and the staleness of the claim, where no statute of limitation governs the case. In such cases courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, and refuse to interfere, where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the parties in possession, which will appeal to the conscience of the chancellor. The party who makes such appeal should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his

case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer.' The bill, in this case, is entirely defective in all these respects. It is true, there is a general allegation that the 'fraudulent acts were unknown to complainant till within five years past,' while the statement of his case shows clearly that he must have known, or could have known if he had chosen to inquire at any time in the last thirty years of his life, every fact alleged in his bill." And in 2 Perry on Trusts (6 Ed. by Howes), sec. 861 and note, it is said: "Equity will not usually lend its aid to establish or enforce a stale trust; and when there has been great delay in bringing suit, even though the trustee has fraudulently concealed the facts from the beneficiary, the latter must definitely set forth in his bill the cause of his ignorance, the impediments to an earlier prosecution of his claim, the means used by the trustee to mislead him, and how and when he acquired a knowledge of his rights," citing cases. To prevent the operation of the doctrine of laches or the staleness of the claim by a court of equity, the trust should be *clearly* established, and there should be some fraudulent concealment by the party affected by it of the facts, and an accounting for long delay in enforcing rights by the *cestui que trust,* and a showing of proper diligence. It was so held in the *Badger case, supra.* In *Paschall v. Hinderer,* 28 Ohio St., 568, 578, cited and quoted from in 1 Perry on Trusts (6 Ed.), sec. 229 and note, at p. 338, it is said that the statute will bar where there has been an open denial or repudiation of the trust, brought home to the *cestui que trustent,* which requires him to act, at the time afterward elapsed amounts at law to a bar, or when circumstances exist which, with the lapse of time, raise the presumption that the trust has been discharged or extinguished. This doctrine of presumption of abandonment of rights, or laches, was adopted for the sake of repose, and because time necessarily obscures all human evidence, and deprives the parties of the means of ascertaining the nature of the original transaction and may close the doors of proof to those who claim under the party charged with the fraud or the assumption of a trust. It would be unfair and inequitable to listen to a party alleging a fraud or a trust after so long a lapse of time, and especially when it appears that the only parties to the transaction are dead, or so disabled by mental and physical infirmities, as in this case, as to deprive the party against whom the trust is asserted of the benefit of their testimony. And in the same case of *Paschall v. Hinderer, supra,* the Court, quoting with approval from *Williams v. First Presbyterian Church,* 1 Ohio St., 478, said: "Although it is true, as a general rule, that as between trustee and *cestui que trust* lapse of time is no bar, yet it is equally true that where the former, with the knowledge of the latter, disclaims the trust, either expressly or by acts that *necessarily* imply a disclaimer, and unbroken possession follows in the trustee, or those

claiming under him, for a period equal to that prescribed in the act of limitation to constitute a bar, *such lapse of time, under such circumstances,* may be relied upon as a defense." This Court affirmed this principle in *McAden v. Palmer,* 140 N. C., at p. 258, and referred to *Speidel v. Henrici,* 120 U. S., at 387, where it was said by *Justice Gray:* "Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them. 'A court of equity,' said *Lord Camden,* 'has always refused its aid to stale demands, where the party slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence; where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction there was always a limitation to suits in this court.' *Smith v. Clay,* 3 Bro. Ch., 640, note. This doctrine has been repeatedly recognized and acted on here," citing many cases.

It appears, therefore, that the statute begins to run when the trust is closed, or when the trustee disavows the trust with the knowledge of the *cestui que trust,* or holds adversely to the claim of those he represented. *Bacon v. Rives,* 106 U. S., at p. 107.

But we think this case shows most clearly that Frank Coxe and Joseph C. Mills so dealt with this property as their own and as free from any trust, and in such an open, notorious, and public manner, and in such a decisive way, as to fix the defendants, or those under whom they claim, with notice. They do not disclaim knowledge of the facts or even attempt to account for their long and protracted delay. The law favors the vigilant, and not those who sleep upon their rights. In this case the plaintiffs and those under whom they claim, and the assignees of the latter, have been in possession of this land all the time, apparently claiming it as their own, without acknowledging any trust or accounting with the defendants or any one else for any of the profits, if any were made. Both Coxe and Mills committed acts which amounted to a distinct disavowal or repudiation of any trust relation between them and Mrs. Carson and Mrs. Williams. It is not alleged or pretended that they have fraudulently or otherwise concealed any facts from the defendants, so as to put them off their guard and to induce their long delay. Those now claiming that there was a trust should have taken notice long ago that the time had arrived for them to assert it, and instead of doing so, they have delayed action until one of the two important witnesses is dead and the other is so feeble in mind and body, with faculties greatly impaired, as to be practically unable to testify. It would not be just or equitable, under the circumstances, to extend the aid of the court to the defendants, and we must decline to do so. The reasons which induce a court of

equity to withhold its aid in such cases are fully given and explained in *Foulk v. Brown,* 2 Watts (Pa.), 216, which was quoted with approval by *Justice Burwell* in *Cox v. Brower,* 114 N. C., 422, and *Justice Hoke* in the case of *In re Dupree's Will,* 163 N. C., 256, as follows: "The rule of presumption, when traced to its foundation, is a rule of convenience and policy, the result of a necessary regard to the peace and security of society. No person ought to be permitted to lie by whilst transactions can be fairly investigated and justly determined until time has involved them in uncertainty and obscurity, and then ask for an inquiry. Justice cannot be satisfactorily done when parties and witnesses are dead, vouchers are lost or thrown away, and a new generation has appeared on the stage of life, unacquainted with the affairs of a past age, and often regardless of them. Papers which our predecessors have carefully preserved are often thrown aside or scattered as useless by their successors. It has been truly said that if families were compelled to preserve them, they would accumulate to a burdensome extent. Hence statutes of limitations have been enacted in all civilized communities, and in cases not within them prescription or presumption is called in as an indispensable auxiliary to the administration of justice." See, also, *In re Beauchamp's Will,* 146 N. C., 256; *Headen v. Womack,* 88 N. C., 468. It was held in the case of *In re Beauchamp's Will, supra,* that coverture would not prevent the operation of the rule as to long delay and laches. See *Headen v. Womack, supra.*

Plaintiffs contended that defendants could not recover on their counterclaim, because they had not alleged or proved that the clause of defeasance, or the terms creating a trust, had been omitted from the absolute deed by ignorance, mistake, undue influence, or fraud, which they insist is essential, and they relied on *Sprague v. Bond,* 115 N. C., 530; but a decision of this point is not necessary, as we base our conclusion on another and sufficient ground.

This case was submitted to the jury upon the theory that the deed to Frank Coxe and his letters to the two *feme* grantors, constituted a mortgage, as the second issue will show. If this be the true construction, the cause of action was barred by the ten years statute, the mortgagee having remained in possession all the time; but the transaction partakes more of the nature of a defeasible purchase, as the vendors were not debtors to the vendee (*Robinson v. Willoughby,* 65 N. C., 520), and therefore they could not have been sued by the vendee for the amount ($6,000) paid to them. The sale was conditioned on the returns being, within a reasonable time, sufficient to pay him back the purchase money, interest, and all expenses of working the mines, and this did not turn out to be the case. The proposition in the letter of 9 April, 1881, to Mrs. Carson, was never accepted and carried out, and does not, therefore, alter the situation. The letter also shows that Mr. Coxe warned the

vendors not to rely on the condition as to profits, because he was quite sure they would not be realized, but to rely on the money he had paid to them alone, as no mine in this State had been profitable, so far as he knew. We hold, though, that on the ground of laches and long delay (more than thirty years), unexplained, defendants have lost any right they may have had to an accounting. Besides, the evidence does not show that the condition upon which they might redeem or recover the land was ever fulfilled, but tends to show the contrary.

In the discussion we have assumed that defendants had an equity, but it is not necessary to decide this question, as, if it ever existed, it has been lost by their delay and inaction. As said by this Court: "Very certain it is, however, that the judgment of nonsuit should not be disturbed, for though it should be established and declared by a verdict that permanent damage has been done to the plaintiff's estate and interest, it is perfectly clear, both from the allegations of the plaintiff and the uncontroverted facts, that the plaintiff's cause of action is barred by the three-year statute of limitations. The statute being properly pleaded, the error as to permanent damage, if any was committed to the plaintiff's prejudice, was harmless, and no good would result by awarding a new trial." *Cherry v. Canal Co.*, 140 N. C., 425. We, therefore, must affirm the judgment.

Affirmed.