Defendant was indicted for the murder of William Brock, deceased, and on a plea of not guilty — on the issue joined and evidence offered — there was a verdict of murder in the first degree, and judgment was accordingly rendered. *Page 767 
The evidence for the State substantially is: That the prisoner, Love, shot and killed one William Brock on 13 January, 1923, about 11 o'clock at night. Brock was going along Pigeon Street in Waynesville on his way home. Love followed him along Pigeon Street beyond the path leading to Love's home. Brock was shot with a pistol, the ball entering near the left nipple and passing through the body, lodging in the skin in the back.
R. A. Teague testified that he had a grocery store, and Brock, the night he was killed, was in the store, near the stove. Love came in and bought some different articles. Brock got up and said he had better go to see how his sick folks were, and passed Love and left the store, and in a few seconds Love went out behind Brock. Teague went to the door. Brock was in front and Love behind him, about 15 or 20 feet apart, walking a little fast. He watched them out of sight. Just as they got out of sight, in about 8 or 10 seconds, he heard two pistol shots, and a man hollered "Oh!" twice. Brock came running back and got into the light and fell. When Teague got there he was dead. Brock was going towards his home. Where the body fell is beyond where the road to Love's house turned off from Pigeon Street.
Paul Gilliland, a relative of Brock, testified to being with Brock that night shortly before he was killed.
Will Whitner, a policeman, who got to the body immediately after the shooting, picked up a knife and rule. "The rule was folded and the knife closed." A little boy picked up a dime. Teague told him about Love following Brock, and he went to the house where defendant lived, and with about 25 men searched for him all night. Defendant surrendered next morning to chief of police. They found no weapon in Brock's pocket.
Joe F. Davis testified that early in the fall of 1922 he was at Bob Love's, father of defendant, and he was in bed, sick. "Bob had a fit, and I stepped to the door and called George (defendant) from the barn, and I remember George saying that ever since he had had that lick in the head by Bill Brock he had had these fits, and that it made him so damn mad, and if it was not for his baby and wife he would go and kill him. I cautioned him, and he said, `It is not over yet.' He said that this man Brock had slipped up behind his father and had nearly killed him because his father had reported him for living in adultery with a negro school teacher."
Dillard Teague testified: "At the time mentioned (June, 1922), me and George Love were riding horseback up Main Street, in Waynesville, and when we got to the postoffice we passed his father, Bob Love. Some man was with Bob, I don't know who, and Brock was walking up the sidewalk. At that time George Love said: `There is that damn son of *Page 768 
a bitch that caused the old man to be like he is, and I would kill him if it was not for my wife and baby, and I may do it yet.' He kind of pointed over toward Brock — throwed his hand over. Defendant was drinking at the time I heard him say that Brock had struck his father over a negro woman. Brock was tried and convicted for the assault on Bob Love and sentenced to 18 months on the chain-gang."
Braxton Mull testified: "I know the defendant, Love, and knew Brock. In July, 1921 or 1922, Mr. George Love and another colored fellow was standing on a sidewalk. Bill Brock passed and George said: `There goes that damn son of a bitch that me or the old man will get one of these days.'"
Will Gaddy testified he was standing with Brock, several months before he was killed, in front of Sloan's Hardware Store, in Waynesville, and saw defendant going down on the other side of the street. He came and walked up even with us, looked at us, and "stood there and eyed Bill like he would jump through him; he turned and walked up the street. We started up the street, Brock was in front . . . and just as we went to the corner, George Love and another fellow, a colored fellow, was standing on the corner of East Street, and Bill (the deceased) walked on the inside of them where they were standing, and just as he stepped up on the other side of East Street, I walked up behind George Love. The width of that street is, maybe, forty feet. Just as he stepped up on the other side I was right behind George and this other fellow, and George said, `Yes, I will get the God damn son of a bitch sooner or later.' When he said that he was looking right toward Bill Brock." State rested.
The defendant introduced Mrs. Willie May Howell, who contradicted, in some respects, the testimony of R. A. Teague.
The defendant introduced Claud Burnett, who testified: "I heard Will Brock (the deceased) make a statement concerning George Love on Saturday night before the killing. It was on the Main Street in Waynesville. Love and Brock met on the street. Brock said, `George Samanth (it was in evidence that the defendant, George Love, was also known and spoken of as George Samanth), this night I am going to kill you,' and the darkey backed off and said, `I don't want to have any trouble with you.' He (Brock) said, `I will kill you before Sunday morning'; and the darkey begged him again and he stepped around in the street and went on. That was some time between nine and ten o'clock, and it was right in front of the upper drug store on Main Street, in Waynesville."
W. H. Creson corroborated substantially the evidence of Claud Burnett. *Page 769 
Ed Love, a kinsman of defendant, testified: "One night, about two months before Brock was killed, we were coming down Pigeon Street above the hospital. He (Brock) was talking to me about this school case, that woman. He asked me if I could fix it so she could get back there. He said he would get George and Bob; that he would get up there in the case and they would not hear George and Bob, and that he was going to get George." On cross-examination, he said defendant and himself had hunted and drank liquor together.
George Love, the defendant, testified: "I was in Waynesville that evening. I had some business to attend to, buying some groceries and things to do up town. I saw Bill Brock on Main Street that evening between eight and nine o'clock. I was going down the street and he was coming up the street, and he met me and he said: `God damn you, this is the night I am going to kill you,' and I said: `Go on, Mr. Brock, I don't want to have any trouble with you: I am not able to fight you.' I was not able to fight him. I had been down with the `flu' all during the holidays and was just getting able to stir about. And there were two other white gentlemen standing on the sidewalk, and I stepped off the street and went around him, and he said: `God damn you, I will get you before sunrise.'" He testified about the same as Teague as to what occurred in the store. Brock went out and then afterwards he went out. He was going to Brown's store to get groceries; the store was beyond where he turned off to go home from Pigeon Street. "When I got to the bridge I did not see any one. This man I had seen had gone out of sight in the darkness. I went on up the street, on up Pigeon Street, until I got up there in front of Mr. Shelton's house where Tom Parker lives, and a man stopped me and he said: `Oh, yes, God damn you, I have got you now,' and I said, `Stop, I don't want to have any trouble with you,' and this man had his arm up and was advancing on me.'"
"Q. Did he have anything in his hand? A. He had his knife in his hand, and I was running backwards, trying to get away from him, and he was reaching for me, trying to get hold of me, and I had a pistol, and I got it out and fired, and he staggered by me and hollered `Oh!' He staggered on by me and off down the street hollering `Oh!'
"Q. Then what did you do? A. I went on up the steps and across the field and went home.
"Q. Where did you go to spend the night? A. I went out to Claud Gibbs.'
"Q. What did you do the next day? A. I sent William Gibbs, Claud Gibbs' son, to go down to my father's and tell the chief of police and the sheriff that I was up town and to protect me, and so Chief Stringfield *Page 770 
and my father came out on some horses and I came to town with them, and they locked me up, and I have been locked up since."
As regards to threats, his testimony varies some from the State's witness, George Davis. He did not remember statements made by the State witnesses, Dillard Teague and Will Gaddy. He denied statements made by Braxton Mull. In regard to the pistol, he testified: "It had been at my father's five or six weeks. I took it out from down at the shop where I had it repaired and left it at my father's. I got the pistol that afternoon and was carrying it home that night, expecting to kill a hog on Monday, as I had been using it for killing hogs."
He testified that Brock's character as a dangerous and violent man was bad. Bigger man than he was. He had two drinks that afternoon.
Joe Sentelle testified he knew Brock's character as a dangerous and violent man, and it was bad.
Tom Brown corroborated defendant as to groceries that defendant was to get from him that night by arrangement made with defendant's father.
G. W. Ferguson, a witness for the State, also testified that the general character of the prisoner was bad and that the general character of several of the State's witnesses was good. He also testified that the deceased did not have the general character of being a dangerous and violent man. The witness admitted on cross-examination that the deceased did have a general reputation of having slipped up behind Bob Love and braining him with an axe handle because Love had exposed his relations with the negro school teacher.
Defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The necessary facts and assignments of error will be considered in the opinion.
The defendant heretofore was convicted of murder in the first degree, and from the verdict and judgment appealed to this Court, and was granted a new trial. 187 N.C. p. 32. It appears in the record, "And upon the defendant's application thereafter duly made to said Superior Court of Haywood County, and for good cause found by said court, the said cause was duly removed to the Superior Court of Henderson County for the trial of said issue de novo conformably to the mandate of the Supreme Court."
The most serious assignment of error by defendant is to the exclusion of the testimony of W. M. Tate, a witness for defendant. The defendant *Page 771 
offered this witness to corroborate a previous statement made by him. Defendant, upon his examination as a witness in his own behalf, gave a slightly different version of the incident and conversation testified to by the witness Davis, and denied any recollection of the conversation testified to by the witnesses Dillard Teague and Will Gaddy. He also denied having made any threat against the deceased in the presence of the witness Mull. And the prisoner further testified by questions and answers as follows:
"Q. Your father got all right did he? A. Yes.
"Q. What was your attitude in regard to Brock — how did you feel toward Brock after your father got well? A. I did not think any more about it."
Tate would have testified as follows: "I know George Love and had a conversation with Love in regard to Bill Brock. It was sometime after Mr. Brock and George's father had had the trouble, and his father had gotten well, and I met George at the post office and was talking to him, and I said they had better bury this thing, it was not enough to get in trouble with Mr. Brock about, and George said: `No, Mr. Tate, I am satisfied that my father has gotten well, and I have no more feeling against him.'"
This evidence was excluded by the court below. The defendant complains that the exclusion of this evidence was very prejudicial and reversible error.
The statement made by defendant to Tate was not under oath. If defendant had not gone on the stand, this was hearsay evidence and clearly incompetent. As a general rule, when a prisoner goes upon the stand as a witness in his own behalf, he puts his character in evidence, and is subject to impeachment. S. v. Dickerson, ante, 332, and cases cited. "It is competent to show previous consistent statements of a witness to strengthen his credibility." Belk v. Belk, 175 N.C. p. 75, and cases cited. It will be noted that these authorities limit the testimony to the credibility of the witness, in no sense can this be considered as substantive evidence of the truth of the facts any more than any other hearsay evidence.
The testimony of the defendant himself is substantive evidence upon the question of his guilt or innocence. The testimony of Tate would only be evidence bearing on the credibility of the defendant as a witness. S. v.Traylor, 121 N.C. 674; S. v. Cloninger, 149 N.C. 567; S. v. Atwood,176 N.C. 708; In re McKay, 183 N.C. 228; S. v. Moore, 185 N.C. 640.
In S. v. Moore, supra, 639, it was held: "It is fully recognized in this jurisdiction that in an indictment for crime, a defendant may offer evidence of his good character and have same considered as substantive *Page 772 
testimony on the issue of his guilt or innocence. And where in such case a defendant has testified in his own behalf and evidence of his good character is received from him, it may be considered both as affecting the credibility of his own testimony and as substantive evidence on the issue."
In S. v. Parish, 79 N.C. p. 614, Reade, J., clearly states it thus: "The rule is, that when the witness is impeached — observe, when thewitness is impeached — it is competent to support the witness by proving consistent statements at other times, just as a witness is supported by proving his character, but it must not be considered as substantive evidence of the truth of the facts any more than any other hearsay evidence. The fact that supporting a witness who testifies, does indirectly support the facts to which he testifies, does not alter the case. That is incidental. He is supported not by putting a prop under him, but by removing a burden from him, if any has been put upon him. How far proving consistent statements will do that, must depend upon him. the circumstances of the case. It may amount to much or very little."
The statements made to Tate were not substantive evidence. It only had a bearing on the credibility of the defendant as a witness. From a careful reading of Tate's testimony, no time is fixed when the conversation took place. From what Tate would have said if the evidence had been admitted, it must have been some considerable time before the killing, and sometime before the threats, testified to by the State's witnesses, were made. The statement, if consistent, was brought about by Tate with the idea of mollifying the defendant. We cannot hold the exclusion of this kind of testimony when not shown to have any probative force, too remote under the facts and circumstances of this case, prejudicial or reversible.
The next exception and assignment of error is set forth in defendant's brief, as follows: "Captain R. A. L. Hyatt was examined as a witness for the prisoner for the purpose of corroborating the testimony of certain of the prisoner's witnesses by showing prior statements by said witnesses to the said Hyatt of the same purport as their testimony upon the witness stand. The cross-examination of this witness was conducted by the solicitor for the Twentieth Judicial District, who, by the courtesy of the solicitor of the Eighteenth District, had the responsible control and direction of the prosecution. In the conduct of said cross-examination said solicitor first emphasized the assistance which this witness had given to counsel for the prisoner in the preparation of the defense, attention being particularly directed to the fact that he had, under the direction of counsel for the prisoner in the preparation of the defense, attention being particularly directed to the fact that he had, under the direction of counsel for the prisoner, visited and interviewed several of the defendant's witnesses. The solicitor then asked the witness if he had not sent a dozen different people to the solicitor to urge him *Page 773 
to allow the prisoner to plead guilty of murder in the second degree. Counsel for the prisoner instantly protested to the court that the suggestions and implications of this question were calculated to be ruinously prejudicial to the prisoner and requested the court to take appropriate measures to remove the prejudice as far as it might be possible to do so. The court thereupon directed the stenographer to strike out the question and instructed the jury not to consider it. Upon the coming in of the verdict, the prisoner moved to set aside said verdict and for a new trial, upon the particular ground that the prisoner had suffered prejudice in the matter above set out, which was not removed by the court's direction to the stenographer to strike out the question and his instruction to the jury not to consider it; that the prejudice so suffered by the prisoner was irremediable by anything that the court had said or done, or could have said or done, and persisted throughout the trial to the final undoing of the prisoner." This assignment of error cannot be sustained.
It is well settled by a long line of authorities that matters of this kind are left to the sound discretion of the court below. Hallman v. R. R.,169 N.C. 132; Massey v. Alston, 173 N.C. 225; Holt v. Mfg. Co.,177 N.C. 170; Maney v. Greenwood, 182 N.C. 579; Brown v. Hillsboro,185 N.C. 374.
The court below has the sound discretion to withdraw or strike out improper evidence or grant a new trial. The authorities are fully cited inS. v. Stewart, ante, 345; 11 Enc. Dig. of N.C. Reports, 961, "Withdrawal of Evidence." We think by analogy this principle applicable here. The motion to set aside the verdict was a matter in the sound discretion of the court below.
It may be noted that Capt. Hyatt testified: "I was born and reared within three miles of Waynesville. I have served on the board of education, as county treasurer, as clerk of the Superior Court and as captain in the National Guard. I was with the board of education two years; county treasurer sixteen or eighteen years and clerk of the court for one term, and was in charge of the military affairs of Haywood County during the World War." He further said he was interested in the prisoner's cause "Purely as a matter of justice, as I looked upon it as a matter of justice to the prisoner. I thought he ought to have a fair trial, ought to have justice in the courts." The fact that so prominent a man was taking an interest in the prisoner, would have a favorable effect on the jury.
If the able and efficient solicitor, in his zeal and loyalty to the State, went further than he should, it was corrected by the court.
We have examined the charge of the court in its entirety, and can find no error in law. *Page 774 
It may be noted that this cause was first tried in Haywood County, and the defendant was convicted of murder in the first degree, on appeal to this Court defendant was granted a new trial. It was then tried in Henderson County, and the jury "for their verdict say that they find the defendant guilty of murder in the first degree, that is, they find him guilty of the unlawful, malicious and premeditated killing of one Wm. Brock." The able and humane judge who tried this case gave a careful charge, setting forth fairly the contentions of the parties and the law bearing on the facts. Defendant has been defended by eminent counsel of skill and ability. It has been held by this Court that the exclusion of evidence that was admissible, which would not change the result is harmless error. Verdicts and judgments are presumed to be right and according to law and justice. Ordinarily the burden is on the defendant to show prejudicial or reversible error. 1 Enc. Dig. of N.C. Reports, p. 701 "Exclusion of Evidence"; In re Ross, 182 N.C. 478; 2 Bishop's New Criminal Procedure (1913) sec. 1276.
The above doctrine of presumption is well recognized in civil cases and enforced in minor criminal cases, but in capital cases the courts should be slow to observe it on account of the sacredness of human life.
The defendant has twice been tried and convicted by a jury, carefully selected under the law. The theory of the State, which the jury found true beyond a reasonable doubt (eliminating threats on either side), was that the prisoner with deliberation and premeditation, while drinking, about eleven o'clock at night, armed, followed the deceased, who was on his way home, unarmed, beyond the path where the defendant turned out to go to his home, beyond the light and in the darkness of the night shot twice and killed him. The conduct of the deceased toward the defendant's father, from the record, was inexcusable and reprehensible, but no one in a civilized common wealth can appeal to the law of the jungle. We base this on the view taken from the facts found by the jury. This finding, under our system of jurisprudence, we are bound by.
The just judge, in commencing his charge to the jury, made these commendable remarks: "You must give no consideration, so far as the facts of the case are concerned, to anything except the testimony given here in this trial; here is the temple of justice, at the threshold of that door, public opinion stands back abashed, it has no part or portion in these proceedings; here pure, simple justice is dispensed freely and alike to all, to the white as well as to the colored, and to the colored as well as to the white, the poor are bereft of no protection. In the eyes of the law they are all equal, standing upon the same plane, punishable by the same law and protected by the same law."
On the entire record we can find no prejudicial or reversible error.
No error. *Page 775