VARSER, J., dissents.
The issues submitted to the jury and their answers thereto were as follows:
"1. Was the execution of the paper-writing purporting to be the last will and testament of Miss Hennie P. Creecy procured by undue influence of Mrs. Nannie C. Cahoon, or others, as alleged in the caveat? Answer: Yes. *Page 302 
"2. Did Miss Hennie P. Creecy at the time of the execution of said paper-writing, to wit, 28 October, 1922, have sufficient mental capacity to execute the same? Answer: No.
"3. Is the paper-writing propounded, and every part thereof, the last will and testament of Miss Hennie P. Creecy? Answer: No."
Nash, C. J., in Marshall v. Flinn, 49 N.C. 203, said: "He then instructed the jury, `that weakness of mind was not, of itself, a valid objection, as the law did not undertake to measure the size of a man's intellect; that it did not require that he should be a wise man; that if he was between the wise and the foolish sort, although he inclined rather to the foolish, he was, in law, capable of making a last will and testament, etc.; that he must do it with understanding and reason, and if the jury should be satisfied that, at the time of executing the supposed will, William Marshall had not understanding and reason, they should find a verdict against the will; that if the supposed testator knew what he was doing at the time of making the supposed will, and that he was giving his property to the plaintiffs, and that they would be entitled to it, provided the forms of law were complied with, then they were to find in favor of the will.' We are at a loss to perceive any error in this part of the charge; it correctly embodies the rule of law upon the question of the alleged insanity of the testator, and is very nearly in the language of some of the most approved writers on the subject."
In Barnhardt v. Smith, 86 N.C. 483, the following instructions were held no error: "The law does not require that persons should be able to make a disposition of their property with judgment and discretion in order to the validity of their act, and it is sufficient if the deceased understood what he was about. . . . The law did not require a high degree of intelligence, but in order to the validity of an act of disposition, it was necessary that the deceased should have fully understood what he wasdoing. (Italics ours.) The exception was to the concluding words. We think there is no error, and that the language used, `fully understood,' means only that the deceased did understand what he was engaged in doing, and is in antagonism to a partial or imperfect apprehension of it."
In Bost v. Bost, 87 N.C. p. 479, Smith, C. J., approves the following definition as to "mental capacity" to make a will: "They were directed that if the deceased has at the time of executing the paper-writing sufficient mental capacity to understand the nature and character of the property disposed of, who were the objects of his bounty, and how he was disposing of the property among the objects of his bounty, then he was capable of making a valid disposition of his property by will. This definition of testamentary capacity is in harmony with former adjudications. Horne v.Horne, 31 N.C. 99; Moffitt v. *Page 303 Witherspoon, 32 N.C. 185; Paine v. Roberts, 82 N.C. 451; Barnhardt v.Smith, 86 N.C. 473"; Crenshaw v. Johnson, 120 N.C. 270; Mitchell v.Corpening, 124 N.C. 472.
This definition in practically the same language is approved in Danielv. Dixon, 161 N.C. 377; In re Craven's Will, 169 N.C. 561; In reRawlings' Will, 170 N.C. 58.
Walker, J., In re Craven's Will, supra, pp. 566-7, says: "As we understand the law, there is no special formula for charging the jury as to the mental capacity required for the valid execution of a deed or will. . . . It follows that one who is incapable at the moment of comprehending the nature and extent of his property, the disposition to be made of it by testament, and the persons who are or should be provided for, is not of sound and disposing mind. And if this mental condition be really shown to exist, the will must fail, even though he may have a glimmering knowledge that he is endeavoring to make a testamentary disposition of his property. It is here to be observed that some of the earlier cases have laid down the rule of testamentary capacity with much more subservience to and consideration for the purported expression of one's last wishes. They seem to have assumed that there must be a total want of understanding in order to render one intestable; that a court ought to refrain from measuring the capacity of a testator, if he have any at all; and that unless totally deprived of reason and non compos mentis, he is the lawful disposer of his own property, so that his will stands as a reason for his actions, harsh as may be its provisions. This ascribes altogether too great sanctity to the testamentary act of an individual as opposed to the law's own will set forth by the statutes and founded in common sense; and it is well that the best considered of our latest cases recede from so extreme and false a standard. Notwithstanding the modern rule to be favored, we should still, however, bear in mind that incapacity is more than weak capacity; and, as already intimated, mere feebleness of mind does not suffice to invalidate a will, if the testator acted freely and had sufficient mind to comprehend intelligently, the nature and effect of the act he was performing, the estate he was undertaking to dispose of, and the relations he held to the various persons who might naturally expect to become the objects of his bounty. While it is true that it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved and great difficulties oppose themselves to so doing, neither is it the duty of the court to lean against probate, and impeach the will merely because it is made in old age or upon the sick bed, after the mind has lost a portion of its former vigor and has become weakened by age or disease. Weakness of memory, vacillation of purpose, credulity, vagueness of thought, *Page 304 
may all consist with adequate testamentary capacity, under favorable circumstances. And a comprehensive grasp of all the requisites of testamentary knowledge in one review appears unnecessary, provided the enfeebled testator understands in detail all that he is about, and chooses rationally between one disposition and another. Schouler on Wills, 2 ed., 68 to 72, and notes." In re Ross' Will, 182 N.C. 477.
1. Schouler on Wills, Executors and Administrators (5 ed.), part sec. 68, says: "For as a general proposition, if the testator possesses mind sufficient to understand without prompting the business about which he is engaged when his will is executed, the kind and extent of the property to be willed, the persons who are the natural objects of his bounty, and the manner in which he desires the disposition to take effect, his will is a good one. To quote Cockburn, C. J., it is admitted on all hands that in these varieties of mental unsoundness as distinguished from mental derangement, `though the mental frame may be reduced below the ordinary standard, yet, if there be sufficient intelligence to understand and appreciate the testamentary act in its different bearings, the power to make a will remains.' It follows that one who is incapable at the moment of comprehending the nature and extent of his property, the disposition to be made of it by testament, and the persons who are or should be provided for, is not of a sound disposing mind. And if this mental condition be really shown to exist, the will must fail, even though he may have a glimmering knowledge that he is endeavoring to make a testamentary disposition of his property."
Nash, C. J., in Marshall v. Flinn, supra, p. 204, approves the following charge as to what constitutes "undue influence": "That the only influence which the law condemns, and which destroys the validity of a will, is a fraudulent influence, controlling the mind of the testator, so as to induce him to make a will which he otherwise would not have made." In re Will ofHurdle, ante, 221.
With these authorities, the law of this jurisdiction, we now come to consider the material assignments of error.
The propounders contend that the will was valid; Miss Hennie P. Creecy had sufficient mental capacity to execute the will, and that the same was not procured by undue influence of Mrs. Nannie C. Cahoon or others. That the court below charged the jury that for Miss Creecy to make a valid will within the meaning of the law that she had to have "a clear understanding
of the nature and extent of her act; of the kind and value of the property devised or disposed of in the will; of the persons who are the natural objects of her bounty, and of the manner in which she desired to dispose of property to be distributed." That this was prejudicial and reversible error. If this *Page 305 
stood alone, the contention of propounders would have some weight, but the court below charged, before the expression "a clear understanding," the law fully and correctly, as follows: "I will now proceed to instruct you relative to the law relative to sufficient mental capacity to execute a will. It does not require the highest degree of intelligence to be able to execute a will, nor does it require a high degree of intelligence to do so. It is not a question of literacy or illiteracy — persons who can neither read nor write, if they are otherwise qualified mentally, have the same right and power to make a will that a person who is well educated has. It does not require education, that is not the question, it is not a matter of education, but of mental capacity. It does not require the highest, nor does it require a high degree of intelligence or mental capacity. If the person making the will has sufficient understanding to know what she was about, and to understand what property she had, and understand to whom she desires to convey it, or devise and bequeath, and the extent and consequences of her act, and what property she is conveying, then she would have sufficient mental capacity to make a will. The question for you to decide is: Did Miss Hennie P. Creecy on 28 October, 1922, the date she made the will, have sufficient mental capacity to understand what property she had, to whom she desired to convey it in the will, and the nature and character of the transaction, and the result and consequence of it. If she did, then she had sufficient mental capacity to make the will. A person has testamentary capacity within the meaning of the law — that is, capacity to make a will, if he has a clear understanding, " etc.
It will be seen that the court before the expression clearunderstanding, uses "sufficient understanding" — "mental capacity tounderstand," and charges that it does not require the highest degree of intelligence, nor a high degree. It is not a question of literacy or illiteracy — does not require knowledge of reading or writing — does not require education. It is a matter of mental capacity.
In re Staub's Will, 172 N.C. p. 141, on the issue of mental capacity, the verdict was for the caveators, propounders were appellants. "The court gave the prayers for instruction asked by the appellants. The court defined testamentary capacity: `A person has testamentary capacity within the meaning of the law if he has a clear understanding of the nature and extent of his act, of the kind and value of the property devised, of the persons who are the natural objects of his bounty, and of the manner in which he desires to dispose of property to be distributed,'" etc.
This charge was neither approved or disapproved by this Court, and upon review of the whole case this Court found no error. The propounders *Page 306 
requested the instruction, lost and appealed, and then assigned error as to their own prayer.
In re Craven's Will, supra, Walker, J., uses the words "Had sufficient mind to comprehend intelligently," etc. Stacy, J., (now C. J.), In re Ross'Will, supra, approves this language.
It will be noted that in Barnhardt v. Smith, supra, exception was taken to "it was necessary that the deceased should have fully understood what he was doing." Smith, C. J., said: "We think there is no error, and that the language used, `fully understood,' means only that the deceased didunderstand what he was engaged in doing, and is in antagonism to a partial or imperfect apprehension of it."
The learned judge who tried this case charged "a clear understanding" from the Staub case, supra. We think it goes a shade beyond the true rule.
The charge should be taken as a whole, and so interpreted. We cannot hold it for prejudicial or reversible error.
The propounders assign error to the following excerpt from the charge: "He has the right to give to one or more persons to the exclusion of all others, but it is a circumstance which the jury may consider in passing upon a person's mental capacity." The whole is: "The mere fact that a person gives his property to one relative to the exclusion of other relatives, does not, of itself, vitiate his will, and any person who has testamentary capacity and is not unduly influenced to execute a will, may give his property to any one he chooses, he has the right to give to one or more persons to the exclusion of all others, but it is a circumstance which the jury may consider in passing upon a person's mental capacity, and if you find in this case that Miss Hennie P. Creecy had, at the time she made the will, to wit: 28 October, 1922, testamentary capacity to make a will, and was not under undue influence, she had the right to give her property in her will to any person she choose to give it to. But if you find she was unduly influenced, or did not have sufficient mental capacity to make a will that would be sufficient to make void the will." This charge is substantially taken from the charge approved In re Staub's Will,172 N.C. p. 140.
Assignments of error were made to the following testimony of R. B. Creecy:
"Mrs. Cahoon told me she owned a farm and that her husband owned a farm.
"Q. Where? Answer: I know where it is situated, or near about.
"Q. What sort of a farm is it? Answer: A very valuable farm, I should say it is among the best farms in the county, and the neighborhood is an elegant neighborhood. *Page 307 
"Q. What would you say in your opinion, it is worth? Answer: I know very little about land values, but I should say it is worth $10,000. I know she owns the farm for she told me so.
"Mrs. Winston is dead. The circumstances of her children are very straining. Duncan (Mrs. Wales) has to work, and she has a small child, too; and her husband has to work for a living. I only own a small lot, no revenue from it, but revenue going out. It is not the lot I live on. I rent. There is no house on it. The Lamb children were mighty poorly situated as far as money is concerned when they left. My last knowledge of them they did not have anything. Their health was frail. One died with tuberculosis and others had it.
"Q. Do you know anything that your brother, Joshua, owned? Answer: Not a thing that I know of. And do not know anything about his physical condition, except what he has written me."
In the record it appears: The caveators are Joshua Creecy and R. B. Creecy, the brothers of the said Miss Hennie P. Creecy, deceased, and that the other caveators are the nieces and nephews of the said Miss Hennie P. Creecy, deceased, being the children of her deceased brothers and sisters. Mrs. Nannie Creecy Cahoon is the sole devisee and legatee named in the said paper-writing, and Joshua Creecy, Pruett Creecy, John B. Creecy, Margaret P. Creecy, Mary Kirkpatrick and E. H. P. Creecy of St. Louis, Sarah B. Plummer of New York, Frances Bitzer of Los Angeles, California; Duncan Winston Wales, of Edenton, N.C.; Thomas Nichols Winston of Boston, Mass., and R. B. Creecy, Selden Lamb, and Mrs. Nannie Creecy Cahoon of Elizabeth City, N.C. Tazwell Lamb, Fred Lamb, John Lamb and Paul Lamb, of El Paso, Texas, and certain children of a deceased sister of the said Miss Hennie P. Creecy, deceased, now living in the State of New York, whose names and exact addresses are unknown, are the sole heirs and distributees of the said Miss Hennie P. Creecy."
We think the weight of authority makes this evidence competent.
In 40 Cyc., p. 1160 — note, it is said: "In passing on the justice or inequality of a will in so far as it bears on the question of fraud and undue influence, the financial condition of persons mentioned in, or excluded from, the will may be considered. Mowry v. Norman, 223 Mo., 463,122 S.W. 224; In re Esterbrook, 83 Vt. 229, 75 A. 1. Thus it is proper to admit and consider evidence that such persons had property of their own (Eastis v. Montgomery, 95 Ala. 486, 11 So. 204, 36 Am. St. Rep., 227), or were entitled to receive a large amount under the will of another person (Davenport v. Johnson, 182 Mass. 269, 65 N.E. 392, 8 Prob. Rep. Ann., 262), or were in poor and straitened circumstances (Gurleyv. Park, 135 Ind. 440, *Page 308 35 N.E. 279; Manatt v. Scott, 106 Iowa 203, 76 N.W. 717, 68 Am. St. Rep., 293." In re Hinton's Will, 180 N.C. 206; In re Stephens'Will, 189 N.C. p. 273.
The record contains 156 pages and the briefs 44. We have read the record, examined the briefs carefully, and heard the oral arguments. The case was carefully tried in the court below, in accordance with the law. If the jury's verdict on the facts as contended by propounders, was an injustice, this is not in our province to determine, but solely theirs. The jury, under our law, are the triers of fact and are presumed to have been men of "good moral character and of sufficient intelligence." They are required to be tax-payers and had paid their taxes for the preceding year. In matters of this kind, this Court, on appeal, has jurisdiction only to review the decision of the trial court "upon matters of law or legal inference." Verdicts and judgments are presumed to be right according to law and justice.
Ordinarily the burden is on the defendant to show prejudicial or reversible error. In re Ross, 182 N.C. 478; S. v. Love, 189 N.C. 774.
On the entire record we can find, in law, no prejudicial or reversible error.
No error.
VARSER, J., dissents.