MORTON H. MEINHARD, Respondent, Appellant, v. WALTER J. SALMON and Another, Appellants, Respondents.

First Department, June 1, 1928.

Joint ventures — what constitutes — individual defendant took lease of property for twenty years which required him to convert existing structure into office building — agreement between plaintiff and individual defendant obligated plaintiff to contribute fifty per cent of amount necessary to reconstruct and provided for division of profits equally and that parties bear losses equally — agreement has been carried out — parties were joint venturers — ownership of land came into possession of person owning adjoining property — individual defendant, through corporation defendant, which he owns, procured renewal of lease on both parcels which required erection of one building on two parcels — said renewal was procured without knowledge of plaintiff — plaintiff entitled to one-half interest in renewal lease as to both parcels upon performing obligations of agreement — impossible to apportion interest in each parcel — assignment by plaintiff of interest in contract to wife did not terminate joint venture.

The individual defendant leased property in New York city under a twenty-year lease which required him to convert the existing structure into an office building. The plaintiff entered into an agreement with the individual defendant whereby he was obligated for the period of the lease to contribute fifty per cent of the amount necessary to reconstruct, alter, manage and operate the property, and whereby he was to receive forty per cent of the net profits of the leased property for the first five years and fifty per cent for the balance of the term. Under that agreement each party was to bear equally the losses, if any, arising or growing out of the lease. The agreement also provided that in the event of no profits the plaintiff was to have no claim against the individual defendant. That agreement was modified twice and the parties referred to their relationship, in reference to the lease, as joint ownership. The plaintiff fulfilled his obligations under the agreement, and the operation of the lease resulted in a profit to both parties.

A proper construction of the written contract with its modifications, and in reference to the conduct of the parties thereunder, establishes that the relation between the plaintiff and the individual defendant was fiduciary, and that they were interested in the lease as joint venturers, and that, therefore, a situation is presented which should be governed by the principles applicable to the law of partnership. It is immaterial that the lease stood in the name of the individual defendant and not in the joint names of the parties.

The plaintiff, therefore, was entitled to all the advantages arising from the lease, including the reasonable expectancy that a renewal thereof might be secured, and, if secured, that the relationship would be continued under the renewal.

Prior to the expiration of the lease the ownership of the land changed and it came into the possession of one who also owned the adjoining land. The individual defendant, without the knowledge of the plaintiff, took a lease from said owner, not only of the parcel covered by the original lease but also of the adjoining parcel. This renewal was taken in the name of the corporation owned by the individual defendant and it provided for the construction of one building covering both parcels of land.

Upon the trial of this action to require the individual defendant to account and to make disclosures concerning the renewal lease, the plaintiff then first learning of all the terms of the new lease elected to assume his share of the liability on the guaranty executed by the individual defendant, and his share of the liability in connection with the whole lease. The referee found it would be impossible, in view of the fact that one building was to be built on both parcels, to segregate accurately the cost of construction, or afterwards to segregate accurately the income or expenses attributable to each building. This finding is supported by the evidence.

It was error for the referee to determine that the plaintiff was entitled to a twenty-five per cent interest in all the property covered by the renewal lease, for such determination is arbitrary and has no basis in fact, and in effect constitutes a new contract between the parties.

In view of the fact that it is impossible accurately and justly to apportion the interest of the parties in the new lease, and in view of the fact that the individual defendant has brought about this condition of confusion of the respective interests of the parties, it is held that the plaintiff is entitled, upon performing the obligations of his agreement, to a fifty per cent interest in the renewal lease as to the entire property leased.

It is immaterial that the new lease was not initiated or that negotiations therefor were not initiated by the individual defendant, for, having undertaken to act in procuring the renewal, he must be held to have represented the joint venture and was acting for the plaintiff as well as himself.

The contention of the individual defendant that the joint venture agreement terminated when the plaintiff assigned his right to receive moneys therein to his wife, cannot be sustained, for the individual defendant at no time recognized that assignment but insisted that the plaintiff was bound by the joint venture agreement, and, moreover, the plaintiff's wife has reassigned her interests to the plaintiff.

DOWLING, P. J., and MERRELL, J., dissent in part, with memorandum.

CROSS-APPEALS from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 4th day of December, 1926.

*Ralph Wolf* of counsel [*Edwin D. Hays* and *Samuel R. Feller* with him on the brief; *Hays, Hershfield & Wolf*, attorneys], for the plaintiff.

*Louis Marshall* of counsel [*Walter H. Bond* with him on the brief], for the defendants.

O'MALLEY, J. The judgment determines that the plaintiff has an equitable interest in a renewal lease and that the defendants hold it in trust for the plaintiff to the extent of his interest therein. The defendants appeal from this judgment and the plaintiff from so much thereof as limits his interest therein to the property covered by the original lease and refuses to extend it to additional property included in the renewal. We agree with the determination of the learned referee in his award of an interest to the plaintiff. The question presented is the extent of such interest.

The plaintiff's rights may rest upon the written agreement of May 19, 1902, between himself and the defendant Salmon, as

modified by subsequent writings and the conduct of the parties thereunder. In this view it becomes unnecessary to pass upon the propriety of the ruling of the referee that prior oral negotiations were merged in the agreement of May nineteenth. The facts necessary to a decision of the appeal will be stated as concisely as the issues presented will permit.

On April 10, 1902, the defendant Salmon took a lease of property then known as the Hotel Bristol at the northwest corner of Fifth avenue and Forty-second street, New York city, for a term of twenty years from May first of that year. By a supplemental agreement made the same day, guaranteed by his father, Rudolph G. Salmon, he was required to immediately convert the structure into an office building. The lessor, Louisa M. Gerry, agreed to advance $100,000 of the amount required for alterations, repayable by adding to the stipulated rent of $45,000 annually the sum of $10,000 a year for the term of the lease. The defendant Salmon was obligated to supply any excess over this sum.

By the agreement between the plaintiff and Salmon of May nineteenth the former obligated himself for the period of the lease to contribute fifty per cent of the amount " necessary to reconstruct, alter, manage and operate " the property. For the first five years the plaintiff was to receive forty per cent of the net profits of the leased property and fifty per cent for the balance of the term. Each party was to " bear equally the losses, if any, arising or growing out of the aforesaid lease of the premises embraced therein." The defendant, who was a real estate operator, was to have full power to manage, lease and operate. The plaintiff at the time was in the woolen business and was entering upon his first venture in real estate.

The agreement further provided that in the event of no profits arising by virtue of the lease or under the agreement, the plaintiff was to have no claim against Salmon for his advances. In the event of the death of Salmon no disposition was to be made of the lease without first consulting the plaintiff, and should Salmon's personal representatives decide to dispose of it to other parties during the remainder of the term, or surrender it to the lessor, it was agreed that the lease should be first offered to the plaintiff on the same terms and conditions. In the event of Salmon's death, also, his personal representatives were required to consult with plaintiff respecting the management and operation of the leased premises.

By a modification in writing in February, 1905, the defendant's right to receive sixty per cent of the net profits was extended one year, or to May 1, 1908. A further modification was effected in

February, 1908.  By such the parties adjusted certain differences that had arisen between them and the defendant was given six per cent of the rents collected for his expenses and compensation in lieu of other sums theretofore allowed.  In correspondence that passed between the parties at the time the defendant Salmon agreed in consideration for such compensation " to devote such time and attention as may be necessary for furthering our *joint interests* in the building," and in this same communication, dated February 8, 1908, the defendant stated that " this agreement shall bind both of us for the remainder of our *ownership of the lease* of the said premises."  This letter also provided that, except as modified, the original agreement should continue in force.

Provisions of the lease from Gerry to Salmon, of the agreement supplemental thereto, and of the agreement between the plaintiff and Salmon, as thus modified, were, in all respects, carried out. The plaintiff and Salmon each contributed approximately $40,000 towards reconstruction costs, in addition to the $100,000 furnished by the lessor.  In addition there was deducted from the plaintiff's share of the net income some $12,000 which was also applied to construction costs, making his capital contribution thereto over $52,000.  The defendant Salmon, too, contributed a like sum, and each paid one-half of the $200,000 which was paid to the lessor in the form of additional rent in consideration of the original advance of $100,000 towards construction.  In addition, plaintiff was charged and paid his one-half share of other reconstruction and alteration expenses during the term of the lease.  Finally, each of the parties received his proportionate share of the net profits, the plaintiff forty per cent and the defendant Salmon sixty per cent, for the first six years of the lease, and each fifty per cent thereof for the balance of the term.  The investment resulted in a profit to each in excess of $500,000.

Construing the written contract, with its modifications, and the conduct of the parties thereunder, we are of opinion that the referee very properly decided that the relation between the plaintiff and Salmon was fiduciary; that they were interested in the Bristol lease as joint venturers; that the defendant Salmon was employed thereunder as manager for compensation, and that the plaintiff had " an equitable interest in the lease, measured and defined by the terms of the contract;" and that in the situation presented the relations of the parties were governed by the principles applicable to the law of partnership.  (*Marvin* v. *Brooks,* 94 N. Y. 71; *King* v. *Barnes,* 109 id. 267.)  To justify such conclusion it was immaterial that the lease stood in the name of Salmon and not in their joint names, and that Salmon was vested with legal title.

With such an interest in the lease the plaintiff was entitled to all its concomitant advantages, not the least of which was the " reasonable expectancy " during the term of the lease that a renewal thereof might be secured.   If such renewal was obtainable such continuance of the old lease would be considered a graft on the old stock and would carry with it the equitable rights which any party had in the renewed lease.   (*Mitchell* v. *Reed,* 61 N. Y. 123; *Robinson* v. *Jewett,* 116 id. 40, 51; *Thayer* v. *Leggett,* 229 id. 152, 157.)

*Mitchell* v. *Reed* (*supra*) was quite similar on the facts and its principle is clearly applicable here.   The plaintiff and defendant were partners in the hotel business.   The lease of the premises, as here, was in the name of the defendant.   Likewise the partnership between the parties terminated before the commencement of the term of a renewal lease which the defendant had taken in his own name and for his own benefit.   It was held that the renewal lease inured to the benefit of the firm and that the plaintiff had an interest therein.   It was said (p. 129): " It has long been settled by adjudications, that generally when one partner obtains the renewal of a partnership lease secretly, in his own name, he will be held a trustee for the firm, in the renewal lease, and when the rule is otherwise applicable, it matters not that the new lease is upon different terms from the old one, or for a larger rent, or that the lessor would not have leased to the firm.   The law recognizes the renewal of a lease as a reasonable expectancy of the tenants in possession, and in many cases protects this expectancy as a thing of value."

It is clear, therefore, that if the defendant Salmon had secretly secured a renewal of the original lease of the Bristol property alone, he would hold it as trustee for the plaintiff, who had an interest therein, upon the terms of the original agreement between them.

We now come to a consideration of facts surrounding the renewal.   Before the expiration of the term Elbridge T. Gerry had succeeded to the rights of the lessor in the Bristol Hotel property.   This consisted of a plot 74 feet 6 inches on Fifth avenue and 125 feet on Forty-second street, referred to as parcel A.   He had also acquired the next adjoining lot to the north on Fifth avenue with a frontage of 25.11 feet, and an additional frontage on Forty-second street to the rear of parcel A, which gave him a total frontage on Forty-second street of 208.4 feet. This additional property thus acquired is described as parcel B. With both parcels he thus became vested with a corner plottage measuring 100.5 feet on Fifth avenue, with a like depth on Forty-

second street, and a frontage on Forty-second street of 208.4 feet, with a like depth on Fifth avenue.

On January 25, 1922, a lease covering both parcels was made to the defendant corporation, owned and controlled by the defendant Salmon who personally guaranteed its covenants. This lease was made without the knowledge or consent of the plaintiff. It was for a term of twenty years from May 1, 1922, and provided for renewals upon certain conditions, for additional terms. It provided for a lump sum rental for the two plots without differentiation, ranging from $350,000 for the first year to $475,000 for the last year. It was made subject to existing leases upon various parcels included in parcel B, and also subject to the Bristol lease. This renewal lease will be referred to as the Midpoint lease, in distinction from the original lease to the defendant Salmon of the property included in parcel A, known as the Bristol lease.

The lessee of the Midpoint lease agreed it would begin " the demolition or removal of the [building] within seven years after the commencement of the term," and would " erect and complete diligently * * *, in substitution therefor, one building covering the whole of the ground demised * * *, as shown on plans and specifications which have been identified by the signatures of the respective parties hereto as the time of the execution and delivery of this lease, and made a part hereof." Midpoint Company agreed to construct the building at its own expense in strict accordance with said plans and specifications and to pay the fees of architects designated by the lessor. The building thus to be erected was to be a modern twenty-five-story building and the cost of its erection according to the evidence adduced on both sides would total between $2,500,000 and $3,500,000. The lease further provided that the lessor would upon request make a building loan to the defendant, as therein provided, and as the construction of the new building progressed, aggregating $1,500,000, to be repaid as an addition to the rent during the continuance of the term.

The plaintiff's evidence tended to show that he first acquired knowledge of this lease in July, 1922. After having made unsuccessful demands upon the defendant Salmon for what he considered to be his rightful participation in the new lease, he instituted this action in equity to require the defendant Salmon to account to him with respect to the joint venture and to make disclosure concerning the renewal lease. The complaint prayed that, at the election of the plaintiff after such disclosure, the defendants be adjudicated to hold the renewal lease in trust for the plaintiff to the extent of his interest therein as may be determined, subject to such terms and conditions as may be equitable, or that the

defendants account to the plaintiff therefor, and that the defendants be enjoined and restrained during the pendency of the action from assigning or transferring or in any way incumbering the renewal lease.

The answer of the defendant Salmon, while admitting the execution of the various writings referred to in the complaint, consisted of denials of its various allegations and set forth in a separate defense that the pretended estate or interest claimed by the plaintiff was not created or declared by any deed or conveyance or other instrument in writing subscribed by said defendant, as required by the Statute of Frauds. The answer of the corporation, in addition to the denials and other matters pleaded by the defendant Salmon, alleged that the claim made by the plaintiff constitutes a cloud on the title of the corporation and prayed for a judgment decreeing that the plaintiff was without any interest in the property.

Upon the trial when the plaintiff was first apprised of all the terms of the Midpoint lease he elected to participate therein to the extent of his interest, and to assume his share of the liability on the guaranty executed by the defendant Salmon and to assume his share of the liability in connection with the whole lease.

The learned referee decided that the interest of the plaintiff in the renewal lease extended only to parcel A, or that covered by the Bristol lease, and that it could not be so expanded as to cover all property included in the Midpoint lease. He decided, therefore, that the plaintiff was entitled to a one-half interest in parcel A, covered by the lease, but no interest in parcel B; that until the buildings which stood on both parcels at the commencement of the term were demolished, the income assignable to each parcel could be easily determined, but that after the erection of the proposed new building, it would be impossible to accurately segregate the income or expenses apportionable to each parcel. He also found that it was impossible to segregate the construction costs of the new building required by the Midpoint lease between parcels A and B, and that the building must be erected, constructed and paid for as a unit, and that when the lease was made it was contemplated by the lessor and consented to by the lessee that parcel B should be used in connection with parcel A, and that such use was inevitable under the terms of the lease.

These findings with respect to the necessity of one building and the impossibility of accurately segregating the cost of construction between the two parcels or of afterward accurately segregating or apportioning the income or expense attributable to each, are fully justified upon the record before us. The defendant's evidence, offered in an attempt to show that it would be possible

to so erect the new structure as to operate it in two separate and distinct parts, was not convincing.

It was properly found, too, that when the new building is constructed in accordance with the requirements of the Midpoint lease, the portion that would stand on parcel A would have no stairs connecting the different floors with each other, no exits, no toilet or elevator facilities, and no means by which a person could pass from one floor to the other.

After the erection of the new building required by the Midpoint lease, the decision awarded to the plaintiff a twenty-five per cent interest in all of the property covered thereby as his equitable share arising out of his joint venture with the defendant Salmon in the Bristol lease. The question presented is whether, as plaintiff contends, his interest extends to all of the property covered by the Midpoint lease; and if not, whether he is entitled to a greater percentage in the profits arising therefrom by virtue of his rights as limited solely to parcel A.

The learned referee, in reaching his conclusion respecting plaintiff's equitable share, took the view that equity might do what the parties themselves as reasonable men might have agreed to under an assumed state of facts. In this connection he said:

" Let us assume that Mr. Meinhard and Mr. Salmon owned Plot A as tenants in common; each an undivided half part; and that Mr. Salmon owned Plot B. Assume that the parties desired to erect upon the whole plot a single building such as is provided for in the present Midpoint lease.

" Seems to me that they, as reasonable men, might arrive at a proportion of the profits of the whole enterprise which would fairly represent Mr. Meinhard's interest in Plot A. I see no sufficient reason why a court of equity cannot do, in this case, what the parties might, if they saw fit, do for themselves."

This was, in effect, the making of a new contract for the parties, which the referee deemed they might or should have made themselves.

No basis for the adoption of twenty-five per cent as plaintiff's interest in the Midpoint lease after the erection of the new building on both parcels is given by the referee, obviously for the reason that it is impossible to form one. It seems to be an arbitrary value based wholly upon what to the conscience of the court seemed equitable. To us it seems inadequate, and were it possible to accept this theory and endeavor to award to the plaintiff an interest less than a one-half share in the Midpoint lease, we should be inclined to increase the percentage in plaintiff's favor.

While parcel A has an area of 9,312.5 square feet, as compared

with 11,587.5 square feet in parcel B, the former is a corner parcel and of sufficient size to carry a desirable building by itself. The plaintiff's evidence was ample to sustain this conclusion. On the other hand, parcel B is irregular in outline and far more unsuitable to carry a separate structure. Its Fifth avenue frontage is limited to 25.11 feet, and the remainder of its frontage is on Forty-second street. Parcel A has been found to represent sixty per cent of the total value of the whole plot, a finding fully justified. So, too, it has been properly found that the rental value in the portion of the new building which will cover plot A is greater than the portion which will cover parcel B. There is a further finding, likewise justified, that parcel B, when used for building purposes in connection with parcel A, reaps an advantage which a corner lot has over an inside lot. So, too, there is a finding that the rental area of plot A in the new building will be 140,096 square feet, while that in parcel B will be only 104,954 square feet.

In the face of these findings there is one to the effect that plot A reaped certain advantages at the expense of plot B, due to the fact that part of the area of plot B, otherwise available for a building, is sacrificed to make a larger rental area to be concentrated over plot A, and that in the common building plot B loses in rental area and plot A gains at its expense. But these findings are in general terms only and serve only to emphasize the impossibility of exact apportionment and segregation.

We are of opinion that from the findings thus made, and upon all the evidence, it is impossible accurately and justly to attempt to apportion the interest of the parties upon the basis adopted by the referee. There is not sufficient distinction of the interests of the parties when the two parcels A and B are thus commingled in a common building. The burden to show such distinction was upon the defendant Salmon, who was in the first instance responsible for the confusion. (*Hart* v. *Ten Eyck*, 2 Johns. Ch. 62, 108; *Hamilton Shoe Company* v. *Wolf Brothers*, 240 U. S. 251, 262; *Callaghan* v. *Myers*, 128 id. 617, 666; *Westinghouse Co.* v. *Wagner Mfg. Co.*, 225 id. 604, 620.)

In the first case cited it was said: " If a party having charge of the property of others, so confounds it with his own, that the line of distinction cannot be traced, all the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it."

We are of opinion that a principle analogous to that applicable to the so-called confusion of goods doctrine in personal property may be here applied. The defendants, appellants, urge that it has no application in the circumstances of this case, because there is a

clear distinction between the identity of interest of the plaintiff and the defendants in parcel A, as represented by the Bristol lease, and in parcel B, as included in the Midpoint lease. Under the primary facts such would be the case, but here we are concerned not with a leasehold including two separate parcels merely. Under the peculiar circumstances of this case, where, by the very provisions of the new lease, a clearly defined building must be erected which will cover both plots, and the maintenance and income and other charges and profits may not be segregated and apportioned, inevitable confusion concerning the respective interests of the parties immediately arises.

In *Acheson* v. *Fair* (3 Drury & Warren, 512, also reported in 2 Connor & Lawson, 208), cited by defendants, it is true that the graft was limited to the lands covered by the old lease and the new lands were freed from any interest arising out of the relations of the parties with respect to the old lease. There, however, the newly-acquired lands were capable of severance. The court stated that if the trust property could not be distinguished, the result would be otherwise. It was said: " If, indeed, trustees mix up property in an improper manner, so that the trust property cannot be distinguished from their own, they may suffer from the consequence of their conduct; but here I must take it for granted that the newly acquired lands can be severed from the others; they may be liable to indemnify the others from the increased rent." So, also, in *Giddings* v. *Giddings* (3 Russ. 241) the real property covered by the renewal appears to have been capable of severance.

*Beatty* v. *Guggenheim Exploration Co.* (225 N. Y. 380, reargument of 223 id. 294), while distinguishable on the facts, seems applicable in principle. There the plaintiff, an expert mining engineer, was employed by the defendant to investigate mining properties and to advise in regard to them. While so engaged, he went to the Yukon territory on defendant's business for the purpose of making an examination of gold placer mining claims. He there became interested with one Perry in a mining enterprise in the same district as that in which he had made his examinations. The essential facts and the principles of law applied were stated in the opinion upon the reargument (225 N. Y. 380, 385): " The plaintiff was sent to the Yukon to investigate mining claims which were the subject of an option. He found certain other claims which were not included in the option, but which he believed to be essential to the successful operation of those that were included. In conjunction with Perry, he purchased rights in the new claims. The two were partners in the venture. Later his employer, appreciating the importance of the claims, determined to buy

them for itself. We think it had the right to say to the agent that he must renounce the profits of the transaction and transfer the claims at cost. *A different situation would be presented if the claims had no relation to those which the plaintiff was under a duty to investigate. But they had an intimate relation. One could not profitably be operated without the other.* Let us suppose that the plaintiff, instead of buying the claims as a partner with Perry, had bought them alone. No one, we think, would say that he could· have retained them against his employer, and held out for an extravagant price, as, of course, he could have done if the purchase was not affected by a trust. It is not an answer to say that he was not bound to risk his money as he did, or to go into the enterprise at all (*Rose* v. *Hayden,* 35 Kan. 106, 118).· He might have kept out of it altogether, but if he went in, he could not withhold from his employer the benefit of the bargain." (Italics ours.)

While it is true that in the case cited there was a provision that the plaintiff had contracted not to become interested directly or indirectly in or connected with any person, partnership or corporation engaged in any similar business, this provision seems not to have been the basis of the decision, for the court (at p. 386) said: " We think, therefore, that aside from the special provisions of this contract, the agent became a trustee at the election of the principal."

It is immaterial, as we view the situation, that Salmon did not initiate the negotiations that led to the effectuation of the Midpoint lease or that the lessor's plans were such that it would not make a lease except of the whole property. It is with the ultimate result that we are concerned. The defendant's violation of trust consisted, not in initiating the negotiations, but in effecting the new lease. The injury done the plaintiff was as great when the defendant Salmon was the tempted, as if he had been the tempter. The plaintiff, it is to be observed, had the same right of renewal as the defendant; and when the latter undertook to act with respect to its exercise, he represented the joint venture and was acting for the plaintiff equally with himself. This applies with equal force, notwithstanding the finding that there was good faith on the part of the lessor and no collusion between him and the defendant Salmon for the purpose of depriving the plaintiff of any right to equity. Plaintiff's claim is not based upon any wrong done him by the lessor, but by his coadventurer.

We have not overlooked defendants' contention that the joint venture, if any, was terminated in the year 1917 by the assignment by the plaintiff to his wife of his right to receive moneys due there-

43

under. Salmon, at no time until this litigation was instituted, claimed termination for any reason. He continued to recognize plaintiff's rights and interests in the venture until 1922, and at all times refused to recognize his wife as having taken plaintiff's place, and insisted that the latter's obligations were not affected by the assignment in question. Moreover, whatever rights the plaintiff's wife took under the instrument of 1917, she reassigned to the plaintiff in 1922. During all this time the defendant Salmon recognized and paid to the plaintiff through his wife his share in the venture.

In reaching this conclusion our effort has been, as required in all cases of this character, to do equity. This purpose cannot be accomplished in our view without awarding to the plaintiff an equal interest in the Midpoint lease with the defendants. In conclusion it should be noted that he takes the benefits burdened with the obligations which that instrument imposes upon him. He will be obligated to contribute equally to the capital necessary to erect the new building, and will necessarily run an equal risk with the defendants in the chance that the venture thus continued may prove unprofitable. He has seen fit to elect to continue in the venture and to take his chances of profit or loss. To this we think he is clearly entitled.

It follows that the judgment should be modified as herein indicated, and as so modified affirmed, with costs to the plaintiff.

FINCH and MARTIN, JJ., concur; DOWLING, P. J., and MERRELL, J., dissent in part.

DOWLING, P. J. (dissenting). I concur in all of the within opinion except so much as holds that plaintiff is entitled to a one-half interest in the lease in question. The finding is that parcel A represents sixty per cent of the value of the entire plot. I think, therefore, that plaintiff's interest is legally and equitably limited to one-half of sixty per cent of the lease, or thirty per cent thereof, instead of the twenty-five per cent awarded by the referee or the fifty per cent awarded by the within opinion.

MERRELL, J., concurs.

Judgment modified as indicated in opinion, and as so modified affirmed, with costs to the plaintiff. The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.