This is an action brought by plaintiffs against the defendant to recover $2,400 of Liberty Bonds. If the bonds for any reason cannot be returned, the value as a priority and trust claim.
The evidence on the part of the plaintiffs was to the effect that they are executors of the last will and testament of J. R. Bright, who deposited with the Bank of Sanford, U.S. Liberty bonds totaling $2,400 in 1917 and 1919. The receipt for same was signed by J. M. Ross, Cashier (by Miss Judith M. Ross) and Ida C. Holmes (now Mrs. W. M. Cade). On the first receipt, dated 5/2/1917, is the following: "Liberty Loan Bonds — This receipt must be surrendered when bond is delivered." Second receipt, dated 8/15/1919: "For safekeeping in bank vault the following (naming the Liberty Bonds). Sealed contents and value unknown. The above property to be delivered only to person named hereon or legal representative upon return of this receipt." On reverse side: "This Bank will give the same care to property left for safekeeping that it does to its own property, but beyond that does not assume responsibility. Bank of Sanford, by I. C. H." The third receipt, dated 3/17/1919, is in similar language but for different bonds. The above were all signed for Bank of Sanford by J. M. Ross and Ida C. Holmes.
J. R. Bright in his lifetime took up some of these Liberty Bonds, leaving $2,400.00, as follows: Liberty Bond for $1,000.00, No. 232974; Liberty Bond for $500.00, No. 31617; Liberty Bond for $500.00, No. 843502; Liberty Bond for $100.00, No. 7292931; Liberty Bond for $100.00, No. 7292936; Liberty Bond for $100.00, No. 7292929; Liberty Bond for $100.00, No. 7292930. The amount herein sued for.
The evidence was to the effect that the Page Trust Company, under deed dated 4 January, 1922, took over the Bank of Sanford's land and choses in action. Following the execution of the deed, the Bank of Sanford did not continue in active business, but the Page Trust Company then occupied the building formerly occupied by the Bank of Sanford. On the day the deed was executed, Miss Judith M. Ross was an employee of the Bank of Sanford and later was an employee of Page Trust Company. There was no period of time between that in which the Bank of Sanford conducted business and the Page Trust Company conducted business. Page Trust Company occupied the identical part of what is known as the Commercial Bank Building in Sanford when it began doing business in Sanford. When it began business, Page Trust Company employed the same employees that were employed by the Bank of Sanford immediately prior thereto. The papers and deposits on hand in the Bank of Sanford at the time of that deed were transferred to Page Trust Company. Miss Judith M. Ross was in the bank as an *Page 413 
employee at the time the Bank of Sanford sold out and she was there at the time Page Trust Company went into receivership. She was continuously in the employment of Page Trust Company. After Gurney P. Hood took over Page Trust Company in May, 1933, Miss Judith M. Ross was there in the bank. The Liberty Bonds are not mentioned in the deed of conveyance.
E. R. Buchan, vice president of the Bank of Sanford, testified, in part: "I know Miss Judith M. Ross very well. She was in the employment of the Bank of Sanford prior to and at the time it was taken over by Page Trust Company. She was cashier at the time of Bank of Sanford. She then continued in the employ of Page Trust Company, and she was assistant cashier and chief bookkeeper of Page Trust Company. . . . During all the time I was connected with Page Trust Company and on through the time until Page Trust Company went into liquidation. After Mr. Hood, the Commissioner of Banks, took over Page Trust Company, she was employed in the work of liquidating the bank. . . . I was familiar with that form of receipt. That is the form that was used by the Bank of Sanford. That was a receipt for papers that were given to the Bank of Sanford for safekeeping, not for deposit, but for safekeeping. . . . Miss Ida Holmes was bookkeeper and teller of the Bank of Sanford. She was accustomed to perform any duties incident to the workings of the bank other than making a loan. (The receipts signed by Judith M. Ross and Ida C. Holmes were identified as in their handwriting.) Mr. Bright was a customer of the Bank of Sanford for many years and from time to time he brought papers in there, valuable papers, for safekeeping, which the bank was in the habit of taking. . . . There was no property that the Bank of Sanford had or owned or had for safekeeping that I remember that did not pass over to the Page Trust Company. There was not anything there left with the Bank of Sanford that Page Trust Company did not take. . . . When Page Trust Company succeeded the Bank of Sanford, the same method of handling matters was pursued with respect to matters that were in the bank for safekeeping."
Mrs. Eugenia Bright testified, in part: "I qualified as executrix, I had transactions with Page Trust Company in regard to bonds of my husband. It was soon after I qualified, about a month or six weeks thereafter, that I saw someone connected with the Page Trust Company about the bonds. I know of my own knowledge of Mr. Bright's having bonds there. I went to Page Trust Company to see Miss Ross and I saw her. When I went there to deposit my insurance, my lawyer in Chatham County had asked me to bring up everything, that he was going to settle up and I asked her about the bonds and she said that `they would look them up, did I have anything to show for it,' and I told her I did not *Page 414 
know that I would have to have anything, that I thought they were there for safekeeping, and she said, no, they could not do anything about it unless we brought up the numbers or whatever it was and she said though they would try to get them up and would I call again soon, and I told them, yes, I would as soon as I could. I know that my husband, J. R. Bright, had bonds because I used to go with him to the bank for him to get his coupons to get the interest on them, and he always would say that he would have to go and Miss Ross always clipped the coupons and fixed it for him. . . . I was at Page Trust Company with Mr. Bright once or twice after that. He would generally get his interest on the bonds when he went there. He always called on Miss Ross. I never knew him to call on anybody else. She generally fixed it up and she was the one and only one I went to and asked about bonds at that time and she would put me off from time to time, that they would get them up and always promise me she would get them up. She never turned them over to me. They said if I would bring the numbers they would. At the time Mr. Bright died I did not have these receipts. If I had them I didn't know where they were. I found the receipts with the deeds, amongst his deeds, his land deed, and I was not looking for them, I have looked for them so many times I had about given them out, but I found them and I brought them to Sanford and turned them over. I have never received these bonds from Page Trust Company or anybody that I know of. I don't know that I could tell exactly when I found these receipts. I don't remember whether it was 1933 or 1934. It was along then. . . . I went to see Miss Ross about the bonds the first time in about a month or six weeks after my husband died. She said to call back again, she could not produce them right then but she would get them up for me and the next time she said what do you have to show for it, and I told her I did not know I would have to show for it, I thought they were there for safekeeping and I did not have anything to do but call for my bonds, and she said if I would bring the numbers she would get them up. That if I would bring the numbers she would know how to get them up and without the numbers she could not do it."
Numa R. Bright testified, in part: "After Page Trust Company succeeded the Bank of Sanford, these bonds were still there at the same place. Very often, something like twice a year, my father would go there when he would get ready to pay his taxes and he had some insurance and the premiums were very large on it, and he kept those bonds there for the purpose of getting the interest off them to pay his policies, and he would go and get Miss Judith M. Ross to pay his tax and to pay the dividends on his policies. From 4 January, 1922, to the date of my father's death I expect I was in there with my father eight or ten times. *Page 415 
We usually went twice a year. Miss Judith M. Ross waited on us when we were there for that purpose. Ordinarily, he would tell Miss Judith M. Ross his business and she would go back into the vault and get the bonds. He would have the numbers on a little book or strip of paper, and she would go and get the bonds and take the scissors and clip those little coupons off and would drop them in a box and would give him the cash for them. My father died 8 May, 1929. I was at the bank with my father just a short time before he died — the year before, in the fall. Ordinarily, I would bring him to Sanford. On that last visit we went in and got the coupons off the bonds. . . . She said that she could not locate the bonds and asked my mother to bring this identification, the number of the bonds. At that time we did not know that we had the receipts for the bonds. We did not have the receipts with us. We had not found them until the latter part of 1933 or the early part of 1934. . . . I expect we went to the bank to see about these bonds twelve or fifteen times. . . . I remember when Page Trust Company ceased doing business as a bank of deposit. When that happened I got some notices from the bank relative to it and my mother got one, she had a deposit at the bank; my father had one and my little boy had a little savings account and they sent us out three little slips to file proof of claim, I believe they called it. I am not very familiar with that type of work, and I carried them over and filed them and when I turned those three sheets in I think it was Mr. Womack. . . . He was one of the bank officials. He was clerk or teller or whatever you call him in there. . . . That time was right soon after Gurney P. Hood took over the bank — that is, the Page Trust Company. (Q) When you turned that over what occurred? Ans.: This party asked me if that was all and I said we have got some bonds here that we have been trying to locate, will I have to file for them, and he said, No, asked me how they were left, and so forth — . (Objection; overruled; exception.) And I told him they were just left there for safekeeping and he said, `It is not necessary to file any proof of claim for them. We will turn the bonds over when we find them.' . . . I filed three claims for some deposits. The man with whom I filed the claims said that it wasn't necessary to file anything for the bonds. It was the same man with whom I was directed to file my claim for deposits that told me that. (At that time there was no discussion about the numbers of the bonds or the kind of bonds. He just told me that if they were left there for safekeeping I would not have to file; that when they got the bonds to call in some day and they would get up the bonds and turn them over to me.) (Objection; overruled; exception.) . . . I got the letter from Mr. Hinsdale dated 9 June, 1934. . . . The letter I got from Mr. Hinsdale says, `I have before me your claim for preference against the Page Trust *Page 416 
Company for $2,400 arising from Liberty Bonds left with the Bank of Sanford for safekeeping.' They are the same bonds that we are suing for in this suit. Mr. Hinsdale says in the letter, `In the opinion of the liquidating agent, this does not constitute a claim against Page Trust Company. The claim is therefore denied. Yours very truly, S. J. Hinsdale, Liquidating Agent.'. . . Mr. Bright, my father, had other bonds besides these that are included in this suit. This $2,400 there with Page Trust Company for safekeeping. I went with him to Page Trust Company and got two of those bonds. Their denominations were $500.00 each. My father went in and called for Miss Judith M. Ross, and I think she was busy or maybe out for lunch and a young man waited on him there and went and got the bonds and delivered them to him. At that time my father had receipts for his bonds. He was not given any bonds at that time without the surrender of the receipt. He surrendered receipts for them. These receipts that have been introduced in evidence for the bonds described in the complaint were in Mr. Bright's possession at that time."
Mr. W. D. Bright (uncle of N. R. Bright) testified, in part: "Mr. N. R. Bright and us was together and we went in her office and I asked her had she found out about those bonds that she had been in possession of and that was the only — I don't know but very little about it. Well, Miss Ross said she had not located them, that when Mr. Dyer taken them over she had control of them until he taken them over and then she had no more further use for them. She said she had them in her possession or control of them until he came in. Well, I would know Mr. Dyer whenever I would see him. I think he was in the Page Trust Company bank."
Miss Judith M. Ross testified, in part, for defendant: "I worked for the Bank of Sanford in 1918 and 1919. I was cashier. I knew J. R. Bright, known as John Robert Bright. Mr. Bright had with the Bank of Sanford, for safekeeping, certain bonds. Page Trust Company purchased the assets of the Bank of Sanford in December, 1921. I worked for the Page Trust Company after that in the capacity of bookkeeper. I remember seeing some bonds in the vault there belonging to Mr. Bright after that time. After Page Trust Company took over the Bank of Sanford at different times, Mr. Bright would come to get the coupons clipped and those were the only times I saw them, but I don't recall how often, but occasionally he would come to get the coupons clipped from them and place them back. . . . Mr. Numa Bright never came inside the bank with his father. Mr. Bright would come around on the inside but Numa Bright did not. I never saw Mrs. Bright there with Mr. Bright. Mr. W. P. Dyer came to Page Trust Company in June, I think, 1927. After Mr. Dyer came to Page Trust Company, I saw *Page 417 
Mr. Dyer and Mr. Bright handling a transaction and I think closed out the bonds. There were no more bonds seen after that. I saw them do that. I never saw those bonds in the bank after the transaction I have stated. I saw Mr. Bright and Mr. Dyer have a transaction in the bank after Mr. Dyer came there. I did not see the bonds in the bank at any time after that. I told Mr. Bright just what I am telling you. I told Mr. Bright about this transaction that cleared out the bonds, and I had not seen any bonds since. I told Mr. Numa Bright that. I did not at any time promise Mr. Bright that I would get up the bonds for him after the Liquidating Agent took over the assets of Page Trust Company. It was not customary with the bank to always demand the return of the receipts given out for bonds or for papers left there for safekeeping when the bonds or papers were delivered to the customers. . . . After Mr. Hinsdale took charge, Mr. Numa Bright came there at different times, about these bonds. I know Mr. Gentry Womack. He was one of the persons that they had there in charge of receiving and filing claims. . . . I don't know of my own knowledge how many he got or how many he left. I don't pretend to say how many."
S. J. Hinsdale testified for defendant, in part: "I live in Burlington. I have heard a description of the U.S. Liberty Bonds sued on in this action. At the time, 20 May, 1933, Mr. Hood and I took over the assets of Page Trust Company, we did not have the Liberty Bonds sued on in this action in the assets of Page Trust Company which we took over. I did not make any search at the immediate time we took over the assets, but after Mr. Bright claimed that they were there, I made a search for the bonds among the assets of Page Trust Company, and did not find any one of these bonds. . . . After Mr. Hood, as Commissioner of Banks, and I, as Liquidating Agent, took over the assets and affairs of Page Trust Company, we gave notice to creditors about filing claims. There was a notice published in the paper in each county in which the Page Trust Company did business. This notice was dated 14 October, 1933, notifying all creditors to present their claims on or before 20 January, 1934. . . . I never did see any record of any bonds that were there for safekeeping. I found no such record. . . . I know Mr. Dyer, Jr., I think he lives in Charlotte. I was told not long ago that he was working for the R.F.C. . . . When Bright filed his claim, I did not look through there to see if they were any of the numbers."
The judgment in the court below, which indicates the controversy, is as follows:
"This cause being heard at this term before the undersigned judge presiding and a jury; which jury for its verdict answered the issues submitted to them as follows:
"`1. Are the plaintiffs the duly qualified and acting executors of J. R. Bright, deceased? Ans.: "No." *Page 418 
"`2. If not, are the plaintiffs N. R. Bright and Eugenia Bright individually the residuary legatees under the will of J. R. Bright? Ans.: "Yes."
"`3. Were the bonds described and set out in the complaint a part of the residuary estate of J. R. Bright, deceased? Ans.: "Yes."
"`4. Are the plaintiffs N. R. Bright and Mrs. Eugenia Bright individually entitled to maintain this action for the recovery of said bonds? Ans.: "Yes."
"`5. Did the plaintiffs' testator, J. R. Bright, own and leave with the Page Trust Company in trust to be safety kept and held and returned to the said J. R. Bright the United States Bonds described in the complaint, as alleged in the complaint? Ans.: "Yes."
"`6. If so, were said bonds returned to the said J. R. Bright or the plaintiffs by the Page Trust Company? Ans.: "No."
"'7. Was the Page Trust Company a banking corporation created under the laws of the State of North Carolina with its principal office and place of business in the town of Aberdeen, Moore County, at and prior to 20 May, 1933, and did the defendant on said date take possession of the property and assets of said Page Trust Company for liquidation on account of insolvency and file notice of possession of said assets as provided by law in the office of the clerk of the Superior Court of Moore County, North Carolina, as alleged in the answer? Ans.: "Yes."
"`8. Did the defendant, through his liquidating agent, under the provisions of section 218-c, subsection 10, of the Consolidated Statutes of North Carolina, give notice by advertisement to all creditors and depositors to present their claims to the defendant or his liquidating agent on or before 20 January, 1934, as alleged in the answer? Ans.: "Yes."
"`9. Did the plaintiff present to the defendant or his liquidating agent the claim sued on in this action for allowance on or prior to 20 January, 1934? Ans.: "No."
"`10. Did the plaintiffs present to the defendant or his liquidating agent the claim of the plaintiffs sued on in this action as preferential claim on or about 4 June, 1934, for allowance, and was said claim declined and disallowed and notice thereof given to the plaintiffs on 9 June, 1934, as alleged in the answer? Ans.: "Yes."
"`11. Did the plaintiffs bring any action against the defendant or his liquidating agent for the enforcement of their claim sued on in this action within ninety days from the date the said claim was disallowed by the defendant in this action? Ans.: "No."
"`12. Is the plaintiffs' cause of action barred by the ninety-day statute, as alleged in the answer? Ans.: "No."
"`13. Is the plaintiffs' cause of action barred by the three-year statute of limitations, as alleged in the answer? Ans.: "No." *Page 419 
"`14. Are the plaintiffs entitled to recover the bonds, or the value thereof? Ans.: "Yes."'
"Upon consideration thereof, it is decreed, ordered and adjudged: That plaintiffs N. R. Bright and Eugenia Bright, individually, do have and recover of the defendant the United States Bonds set out and described in the complaint of the par value of $2,400, which bonds bear interest at rate 4 1/4 per cent per annum.
"And it further appearing from admissions of defendant's counsel and the court finding therefrom that a return of said bonds in kind is now impossible, in the exercise of its discretion the court directs that this cause be retained for trial before a jury hereinafter to be impaneled the following issue: `What was the value of the bonds described in the complaint on 9 June, 1934?' It is further ordered, adjudged and decreed: That defendant do pay the costs of this action to be taxed by the clerk. W. C. Harris, Judge Presiding."
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be considered in the opinion.
At the close of plaintiffs' evidence and at the close of all the evidence, the defendant in the court below made motions for judgment as in case of nonsuit. C. S., 567. The court below overruled these motions and in this we can see no error.
The evidence which makes for plaintiffs' claim, or tends to support their cause of action, is to be taken in its most favorable light for the plaintiffs, and they are entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
The plaintiffs contend that the appeal was premature. In the judgment is the following: "And it further appearing from admissions of defendant's counsel and the court finding therefrom that a return of said bonds in kind is now impossible, in the exercise of its discretion the court directs that this cause be retained for trial before a jury hereinafter to be impaneled the following issue: `What was the value of the bonds described in the complaint on 9 June, 1934?'"
Conceding but not deciding that the appeal was premature, yet we can see no harm or prejudice to plaintiffs in deciding the case on its merits.
In McAuley v. Sloan, 173 N.C. 80 (81-2), where the judge tried certain issues and in his discretion reserved others, it was said: "This is a matter which will depend very much upon the circumstances of each *Page 420 
particular case, and in the absence of an abuse of such discretions this Court will not disturb the action of the judge." Bank v. Evans, 191 N.C. 535
(538).
The principal questions involved in this case require the determination of the burden of proof in a suit to recover from a bank Liberty Bonds deposited therewith for safekeeping and the application of the statute of limitations to such an action. These were answered in the court below in favor of the plaintiffs, and in this we find no error.
All the evidence was to the effect that the receipts were given for the Liberty Bonds by the Bank of Sanford. One receipt provided that it "must be surrendered when bond is delivered," and another stated that the bond was received for "safekeeping in the bank vault." There was evidence tending to show that the bonds were in the possession of the Page Trust Company after its purchase of the Bank of Sanford. There was further evidence tending to show that no specific claim for these bonds was filed with the liquidating agent because his representative informed one of plaintiffs that, as the bonds were held for safekeeping and were not deposits, it would not be necessary to file a claim. There was evidence, likewise, tending to show that after plaintiffs had qualified as executors for he estate of J. R. Bright, who allegedly deposited the bonds originally, and after the liquidating agent had taken over the assets of Page Trust company, said liquidating agent, on 9 June, 1934, wrote plaintiffs denying their present claim for Liberty Bonds in the value of $2,400. Thereafter, and within three years after the denial of this claim, the original summons in this action was issued on 20 February, 1937.
The deposit of the Liberty Bonds herein, as found by the jury, constituted a special deposit for safekeeping and embodied a duty to hold and deliver the specific bonds.
In Corporation commission v. Trust Co., 193 N.C. 696 (699), is the following: "A special deposit is a deposit for safekeeping, to be returned intact on demand — a naked bailment, the bank acquiring no property in the thing deposited and deriving no benefit from its use. The title remains in the depositor, who is a bailor and not a creditor of the bank.Boyden v. Bank, supra (65 N.C. 13); 3 R. C. L., 517; 7 C.J., 630." Edwardsv. Culberson, 111 N.C. 342. See Bank v. Waggoner, 185 N.C. 297 (302);Proctor v. Fertilizer Co., 189 N.C. 243; Wood v. Bank, 199 N.C. 371;Cocke v. Hood, Comr., 207 N.C. 14 (18); Speight v. Trust Co., 209 N.C. 563.
All the evidence was to the effect that the first receipt was given for the Liberty Bonds by the Bank of Sanford as follows: "This receipt must be surrendered when bond is delivered," also the other receipts for "safekeeping in bank vault." The above property to be delivered "only *Page 421 
to person named hereon or legal representative upon return of this receipt." It was in evidence to the effect that these bonds were in the possession of the Page Trust Company after its purchase from the Bank of Sanford. The court below charged that under the circumstances mentioned the burden of proof as to this phase of the case rested on the defendant in this action. We can see no error in this. Proctor v. Fertilizer Co.,189 N.C. 243 (245); Furst v. Taylor, 204 N.C. 603; Davis v. Dockery,209 N.C. 272; Stephenson v. Honeycutt, 209 N.C. 701.
In 5 Zollman, on Banks Banking, sec. 3115, pp. 121-2, we find: "In most, if not all, cases the depositor will have little or no information as to how the loss occurred. Ordinarily, he can only prove that there has been a loss. Therefore, evidence by him of the delivery of the deposit to the cashier, that the cashier had authority to accept it, and that it was not returned to him on his demand places the burden upon the bank to prove that it exercised the proper degree of care in safekeeping the property. The burden of showing the circumstances of the loss, due care, or delivery to the customer or to a successor bank, or that the deposit was made for an illegal purpose, or of establishing a good and valid reason for the nonreturn of the deposit, is on the bank. A demand on the bank for bonds held on special deposit and its refusal to deliver them, with no other explanation than the statement that it has no such bonds in its possession, is prima facie evidence of their loss by the bank's negligence. The statement of the bank that it has lost or mislaid the bonds in question will not absolve it."
We do not think that plaintiffs' cause of action is barred by the 3-year statute of limitations J. R. Bright, plaintiffs' testator, died on 8 May, 1929. Plaintiffs qualified as executors on 10 July, 1929. Defendant took over the assets of the Page Trust Company on 20 May, 1933. S. J. Hinsdale, Liquidating Agent of defendant, wrote plaintiffs, on 9 June, 1934, as follows: "I have before me your claim for preference against the Page Trust Company for $2,400 arising from Liberty Bonds left with the Bank of Sanford for safekeeping. In the opinion of the Liquidating Agent this does not constitute a claim against Page Trust Company. The claim is therefor denied." The original summons in the action was issued on 20 February, 1937 — within three years of the repudiation or disavowal of the trust.
N.C. Code, 1935 (Michie), sec. 441 (4), is as follows: "Limitations — Within three years an action — (4) For taking, detaining, converting or injuring any goods or chattel, including action for their specific recovery."
5 Zollman, on Banks Banking, supra, part sec. 3116, p. 123, says: "Where a bank receives a special deposit to be surrendered on demand, the statute of limitations begins to run against the right of action for a breach of the contract to return only from the time of demand." *Page 422 
In Robertson v. Dunn, 87 N.C. 191 (195), it is written: "We take the distinction to be, that if it is an express trust or agency, a demand is necessary to terminate the trust and set the statute in operation; but if it is only an implied or constructive trust or agency, then no demand is necessary, but the statute is put in motion as soon as the property is taken into possession or the money received." County Board v. State Board,107 N.C. 366.
In Rouse v. Rouse, 176 N.C. 171 (173), we find: "It is a general rule that, as between trustee and cestui que trust, lapse of time is not a bar to an action, but where the trustee disclaims the trust, to the knowledge of the cestui que trust, either expressly or by acts necessarily implying a disclaimer, and the trustee remains in unbroken possession, lapse of time may be relied upon as a defense. McAden v. Palmer, 140 N.C. 258; Williamsv. Church, 1 Ohio St. 478; Coxe v. Carson, 169 N.C. 137." This matter is fully set forth by Barnhill, J., in Teachey v. Gurley, ante, 288 (293).
Is the plaintiffs' cause of action barred by the ninety days statute, either for failure to bring the suit in ninety days after the time designated for presenting claims, or in ninety days after the claim was presented and disallowed upon notice to plaintiffs? We think not, under the facts and circumstances of this case. N.C. Code, supra, sec. 218 (c), etseq.
It will be noted that sec. 218 (c), supra, says: "Shall forthwith take possession of such bank and all of its assets and business." One of the bank officials was receiving proof of claims from Numa R. Bright, and two other members of the family who filed their claims. The following occurred:
"Q. When you turned that over what occurred? Ans.: This party asked me if that was all and I said we have got some bonds here that we have been trying to locate, will I have to file for them, and he said, no, asked me how they were left, and so forth. (Objection; overruled; exception.) And I told him they were just left there for safekeeping and he said, `It is not necessary to file any proof of claim for them. We will turn the bonds over when we find them.' . . . I filed three claims for some deposits. The man with whom I filed the claims said that it wasn't necessary to file anything for the bonds. It was the same man with whom I was directed to file my claim for deposits that told me that. At that time there was no discussion about the numbers of the bonds or the kind of bonds. He just told me that if they were left there for safekeeping I would not have to file; that when they got the bonds to call in some day and they would get up the bonds and turn them over to me. (Objection; overruled; exception)." *Page 423 
We think the exceptions cannot be sustained if the statute was applicable. The plaintiffs were lulled into inaction and defendants cannot take advantage of their conduct. In Glenn v. Farmers' Bank, 80 N.C. 97
(100), it is said: "The appellant, in the language used by the Court in the last mentioned case, `was not guilty of willful laches or unreasonable neglect,' he ought not to be concluded by the decree from the assertion of his right, as a creditor, to share in the common fund." Cecil v. Henderson,121 N.C. 244 (247); Thomas v. Conyers, 198 N.C. 229; Bank v. Winder,198 N.C. 18.
In construing portions of the New York Act, which are substantially similar to ours, the New York courts have held that a bailor (such as plaintiffs) is not a "creditor" or "claimant" within the meaning of their Banking Acts, and is not required by that law to file a claim before bringing suit. Some of the decisions are as follows:
In re Howell's Will, 237 A.D. 56, 260 N.Y. Supp., 510, 512: "The petitioner urges that the procedure laid down in the banking law does not apply because the bank held this money as bailee and never acquired title thereto; that the relation of debtor and creditor never existed between the bank and the depositor; that no question of priority of claims is involved here. Respondents insist that this is a reclamation proceeding and not one to determine the validity of a claim against the bank, and that, therefore, the successor trustee is entitled to immediate possession of this trust fund without waiting for the liquidation of the assets of the defunct institution. If the title to the money never rested in the trust company, the court has inherent power to order its delivery to the successor trustee, and the provisions of the banking law have no bearing on the proceeding. . . . The determination of this appeal, therefore, depends upon the nature of the relationship which exists between the bank and the trustee."
In In re Bank of Cuba, 198 App. Division, 733, 191 N.Y. Supp., 88, it was held that the New York Banking Law with respect to the presentation of claims of creditors against a bank in liquidation related to the assets of the bank only, and conferred upon the Superintendent of Banks no authority to withhold property to which it had no title and upon which it had no lien; that in that case no title to the drafts in question passed to the bank, but remained in the applicant for a return of draft or its proceeds, and it was erroneous to refuse the relief sought on the grounds that applicant's only remedy was afforded by the provisions of the Banking Law with respect to the presentation and allowance of claims, etc. Re Vavoudis,141 Misc. 823; 252 N.Y. Supp., 779, affirmed; 223 A.D. 672,249 N.Y.S., 87; Re McCarthy's Funds, 139 Misc. 147, 248 N.Y. Supp., 335;Campbell v. Vining, 101 Fla. 939. *Page 424 
The defendant cannot maintain the plea of the statute of limitations, either 90 days or 3 years. The language of the receipt is, "Must be surrendered when bond is delivered." Certain bonds "For safekeeping in bank vault," etc. The Bank of Sanford was a trustee of an express trust and its successor likewise, as there was plenary evidence to that effect and the jury so found. The 90-day statute is inapplicable. If it were it would be inequitable and unconscionable for defendant to be allowed to set same up as a defense.
The last clause of the will of J. R. Bright is as follows: "Then all that I have not mentioned is to be Numa Bright his mother." The Liberty Bonds were not mentioned in the will, therefore they became the property of N. R. and Eugenia Bright, and it was so found by the jury. Kidder v.Bailey, 187 N.C. 505. They are entitled to recover for same and the issue so says. Under the facts and circumstances of this case the word "executors" was treated as surplusage. The issue submitted was in the nature of an amendment to that effect. Bernard v. Shemwell, 139 N.C. 446
(447); Trust Co. v. Williams, 209 N.C. 806 (809); Morgan v. Turnage Co.,213 N.C. 425, 426; Ins. Co. v. Locker, ante, 1 (2). On this aspect we see no prejudicial error. We think there was ample evidence to be submitted to the jury on all disputed issues. Miss Judith M. Ross testified: "After Mr. Dyer came to Page Trust Company, I saw Mr. Dyer and Mr. Bright handling a transaction and I think closed out the bonds. There were no more bonds seen after that." The court below left this aspect to the jury for determination. It may be noted that the W. P. Dyer, Jr., spoken of in this testimony was living at the time and was never called as a witness. We see no error in the court below in overruling the motion of defendant for judgment non obstante veredicto. We think the court below, in an able and careful charge, explained the law applicable to the facts, and C. S., 564, was fully complied with.
On the entire record we see no prejudicial or reversible error.
No error.